**Luis MEJIA and Aura Dina Mejia, Plaintiffs,**

v.

**CITY OF NEW YORK, Airborne Freight Corporation, Brenda Tipton, Daniel McNicholas, and John Skinner, Defendants.**

No. CIV. A. 96–CV–3007(DGT).

United States District Court, E.D. New York.

Oct. 5, 2000.

Leon Friedman, New York City, for plaintiffs.

Richard M. Sand, Garden City, NY, for Airborne Freight Corp., defendant.

Loretta E. Lynch, U.S. Atty., Brooklyn, NY, for Brenda Tipton, defendant.

Michael D. Hess, Corp. Counsel of City of New York, New York City (Isaac Klepfish, Georgia Pestana, of counsel), for City of New York, Daniel McNichols, John Skinner, defendants.

*CORRECTED OPINION*

TRAGER, District Judge.

Plaintiffs Luis and Aura Mejia (the "Mejias") bring this § 1983 / *Bivens* action against the City of New York (the "City"), Airborne Freight Corporation ("Airborne"), U.S. Customs Service Special Agent Brenda Tipton ("S/A Tipton"), and Sergeant Daniel McNicholas ("Sergeant McNicholas") and Detective John Skinner ("Detective Skinner") of the New York City Police Department ("NYPD") (the latter two individuals collectively referred to as the "police defendants"), alleging false arrest, false imprisonment, use of excessive force, and malicious prosecution, all in relation to the controlled pickup of a shipment of cocaine. The Mejias also assert pendent state law claims for false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against various defendants. Each of the defendants now moves for summary judgment on the basis of probable cause, qualified immunity, and/or various procedural grounds.

## Background

### (1)

The initial events precipitating this case are not in dispute. On November 18, 1993, U.S. Customs Service ("Customs") agents in Miami intercepted a package from Bogota, Columbia, in which 1 pound and 1 ⅝ ounces of cocaine had been hidden. The package contained three books of textile samples, inside the covers of which plastic bags containing cocaine had been concealed. The package had been delivered to Miami by International Bonded Courier ("IBC"), a Columbian express courier, for transfer to Airborne, the connecting domestic courier. The airbill identified the sender as "GABRIEL JARAMILLO LARA, CRA 38 No. 8–06, SANTA FE DE BOGOTA, COLUMBIA, TELEPHONE NUMBER 2686824." The airbill designated the recipient as "COMPLETE DIAGNOSTIC, BEST SPORTS CAR SERVICE, 188–06 HILLEIDE [sic] AVE.,

HOLLIS, N.Y. 11423, U.S.A.," and gave the recipient's telephone number as "(718) 740–2121," but did not list an individual addressee. Complete Diagnostic was an auto repair garage owned and operated by plaintiff Luis Mejia.

Miami Customs officials notified the New York Customs office of their discovery and forwarded the package to S/A Tipton, who then worked out of the New York office. Because the package contained less than one kilogram of cocaine, the matter fell outside federal prosecution guidelines. At the direction of the New York office's supervisor, Special Agent Joseph Gloria, S/A Tipton contacted Sergeant Nicholas on November 18, 1993, about the possibility of the NYPD conducting a controlled delivery of the package.

On November 19, 1993, S/A Tipton contacted Bezmen, who was Airborne's regional security manager, and asked him to arrange to place an entry in Airborne's computer system to reflect a delay due to misrouting in order not to arouse the suspicion of the unknown recipient. Bezmen agreed to the request and offered to cooperate in any subsequent controlled delivery of the package.

On that same date, Customs Special Agent John Raffa ("S/A Raffa") visited Complete Diagnostic. While there, S/A Raffa picked up a business card for the garage, which included the name "Luis" and the telephone number (718) 740–2121.

On November 22, 1993, S/A Tipton and Sergeant McNicholas discussed tentative plans for Customs to sign over the package to the NYPD for a controlled delivery on the following day. Later on the 22nd, plans for a controlled delivery were abandoned when Sergeant McNicholas reported that he had gone to the auto garage and had seen many workers, a heavy workload, and no individual designated to take delivery. Under these circumstances, Sergeant McNicholas stated that he could not in good conscience proceed with the controlled delivery since there would be no

way of knowing whether the person who happened to sign for the package was the intended recipient.

(2)

At this point in the story, plaintiffs' and defendants' accounts of the events diverge widely. First, the defendants'. At some point in the day on November 29, 1993, S/A Tipton spoke to Bezmen, who had previously left a message for her. Bezmen told her that he had noticed an entry on Airborne's computer that indicated someone named "Luis" had called on November 22, 1993, asked about the package, and left the phone number (718) 740–2121—the number for Complete Diagnostic.[1] S/A Tipton and Sergeant McNicholas then conferred to make arrangements for a controlled pickup at Airborne's facility the next day, November 30, 1993.

At S/A Tipton's request, Gennarelli, an Airborne cartage supervisor, called the contact number and asked for "Luis Mejia."[2] A person answered and said: "This is Luis." Gennarelli told "Luis" that his package was available for pickup at Airborne's Inwood station, which is located near JFK. Gennarelli further advised "Luis" that he should come to pick up the package after noon the next day, November 30, 1993. Gennarelli does not recount having to give "Luis" any reasons as to why he was required to pick up the package at the Airborne office as opposed to it being delivered to Complete Diagnostic; Gennarelli states that "Luis" simply agreed without asking any questions. According to Gennarelli, the call lasted approximately two minutes. After the call, Gennarelli advised S/A Tipton that "Luis" said he would come to Airborne's facility the next day to pick up the package.

On November 30, 1993, S/A Tipton brought the package to the Airborne's Inwood station and signed it over to Detective Skinner. According to S/A Tipton, she had no further role in the controlled delivery, though she remained at the facility until Mr. Mejia arrived.

Detective Skinner placed the intercepted package in an Airborne box, sealed it, and gave it to Gennarelli. The police then waited for Mr. Mejia's arrival out of sight in prearranged positions.

Later that day, Mr. Mejia set off for the Airborne office along with his wife. Along the way, he got lost and had to call for directions. Gennarelli answered, or was given, the call and provided Mr. Mejia with additional directions. Shortly thereafter, Luis Mejia entered Airborne's facility and walked up to Gennarelli who was dressed in an Airborne uniform. Mr. Mejia signed for the package, accepted delivery and walked out. According to Gennarelli, Mr. Mejia did not inspect the package while he was in the office or indicate in any way that the package was unexpected. Accord-

---

1. No copy of this computer entry has been produced, and the computer file no longer exists. Bezmen testified that he printed a copy of the screen and sent it to the Queens County District Attorney's ("D.A.'s") office during the state criminal proceedings, but in response to a court order directing the D.A.'s office to unseal its file and deliver it to the Assistant U.S. Attorney who represents S/A Tipton, the D.A.'s office stated that it could not locate the file. Notably, the physical document was not produced or even mentioned at Mr. Mejia's criminal trial, despite that the fact that it would have presumably been powerful corroborating evidence for Bezmen's trial testimony.

2. Gennarelli's testimony contradicts that of S/A Tipton on this point. S/A Tipton testified that the update on Airborne's computer system listed only the first name "Luis" and that Bezmen had only given her a first name. (Tipton Dep. at 64, 66). S/A Tipton further testified that she did not know Mr. Mejia's last name until after the arrest. (*Id.* at 99.) Gennarelli, however, testified emphatically that S/A Tipton had given him a first and last name to call: "Luis Mejia." (Gennarelli Dep. at 29.) Moreover, Gennarelli specifically testified that when he called Complete Diagnostic's number, he asked for "Luis Mejia." (*Id.*) Mr. Mejia testified that none of the purported Airborne employees ever called him "Mr. Mejia" or "Luis Mejia." (Luis Mejia Dep. at 102.) And for his part, Bezmen testified only that he could not recall if there was a last name on the computer. (Bezmen Dep. at 45.)

ing to Detective Skinner, who was watching from the reception area of the Airborne office, once back in the car, Mr. Mejia handed the package to his wife, who immediately opened it.

About ten minutes later, Sergeant McNicholas, Detective Skinner, and several other NYPD officers pulled Mr. Mejia's car over to the side of the road in order to effect the arrest. The police defendants deny displaying their weapons during the arrest. When Detective Skinner approached the car, he observed that Mrs. Mejia had the three portfolios on her lap. After removing her from the car, Detective Skinner examined the portfolios and discovered that one of them had been ripped open, and a white powdery substance was visible.[3]

In addition, Sergeant McNicholas states that, while at the arrest scene, Mr. Mejia spontaneously asked him: "What is this for, the drugs?"

For her part, S/A Tipton states that she did not actively participate in the arrest.

However, while driving back to her office, she noticed activity on the side of the road and recognized the detectives.[4] S/A Tipton then pulled over, got out of her car, and spoke to Sergeant McNicholas. S/A Tipton states that she had no contact with the Mejias during the arrest.

At some point during the arrest, Mrs. Mejia told Sergeant McNicholas that similar portfolios had been delivered to her and her husband's auto garage the previous day.[5] With Mrs. Mejia's consent, Sergeant McNicholas, Detective Skinner, and one Detective Fox then went to the garage, entered the Mejias' office, and seized similar books whose front and back covers had been torn.

The books seized from the Mejias' office had been mailed in a package that bore the same address as the intercepted package, including the misspelling of Hillside Avenue ("Hilleide"). In addition, the package had almost the same return address ("Kr 38 no. 8–06, tel. 2686524, Santa Fe de Bogota, Colombia") as the intercepted

3. (Skinner Dep. at 68–69, 72–73.) Detective Skinner's deposition testimony on this point is slightly different than his testimony before Mrs. Mejia's grand jury. There, he stated that one of the portfolios was open on her lap and the cocaine was already visible when he approached the Mejias' car. (Pl.'s Ex. P, at R.T.8.)

Interestingly, S/A Tipton testified that when she received the portfolios from the Miami Customs office she had inspected the portfolios and noticed that "one binder was opened up by the inspection ... there was cocaine in there, and through the opening you could see the cocaine inside the binders." (Tipton Dep. at 113.) When asked if it had been ripped open, S/A Tipton replied: "Like maybe with a razor or something like that, inside of the front cover of the binder had been ripped open. I can't remember if the cocaine was still inside or pulled out of the pouch that had the cocaine in it." (Id. at 113–14.) S/A Tipton did not reseal the opening. (Id. at 114.)

S/A Tipton's testimony appears to provide an innocent explanation of the condition of the portfolio when it was retrieved from the Mejias' car. Moreover, her testimony appears to contradict that of Detective Skinner, who examined the portfolios before repackaging them at the Airborne office. Detective

Skinner stated that, prior to the pickup, all of the portfolios were intact, except for a "small hole" on the inside of one of the binders that was made in the course of the Customs field test. (Skinner Dep. at 27.) Detective Skinner further testified that it was not possible to see any cocaine through this "small hole." (Id. at 27, 29.)

4. (See also McNicholas Dep. at 68 (stating that "it was just coincidence that we were there when she just happened to come by").)

5. Sergeant McNicholas testified that Mrs. Mejia spontaneously offered this information when he advised her that she was being arrested for possession of drugs: "I don't recall exactly what she said, but she looked surprised and said something like, 'I don't understand this, we have other books like this at our office. We've received other books like this at our office." (McNicholas Dep. at 60; see also id. at 60–61 (testifying that Mrs. Mejia was the first person to mention other books).) However, Mrs. Mejia testified twice in deposition that she advised Sergeant McNicholas of the other portfolios in response to a question of his as to whether her husband and she had received any other such books. (Aura Mejia Dep. at 93, 190).

package. On the package recovered from the office, the sender identified itself as "INDUNALTEX," the same name emblazoned on the cover of the books seized by Customs agents. No cocaine was detected in the portfolios recovered from the Mejias' office.

Detective Skinner states that later at the precinct house, in the course of taking pedigree information from Mr. Mejia, Mr. Mejia told him: "My wife doesn't know anything about this."

The police defendants deny making any disparaging remarks about Colombians during the arrest or threatening that Mrs. Mejia would lose her children if she went to jail.

### (3)

The Mejias tell a very different story about the events leading up to their arrest and prosecution. In essence, the Mejias allege that they knew nothing about the package from Colombia and that Airborne representatives (or government agents masquerading as Airborne representatives) coaxed and cajoled them into claiming the package under the pretense that the package was a Christmas gift from Venezuela.

Specifically, Mr. Mejia denies that he placed a call to Airborne inquiring about the package. Mr. Mejia testified in deposition that one of his employees, Charlie Diego ("Diego"), received a telephone call on November 22, 1993, from an unidentified individual who asked who owned the business. Diego told the caller the owner was named Luis. The caller also allegedly asked whether the owner was Colombian and whether everyone who worked at the garage was Spanish.

Thereafter, Mr. Mejia states that he received four unsolicited phone calls from Airborne in which one or possibly two purported Airborne agents beseeched him to come to the Airborne facility and pick up the package. The first alleged call took place early on the morning of November 29, 1993. The first caller [6] asked him if he was "Luis" and told him that Airborne had a package for him. Mr. Mejia then stated: "Okay, why don't you deliver it." The caller responded that Airborne could not deliver the package because it was a personal package and that he would have to come and sign for it: "You have to come personally to pick up the package because it is addressed to you." Mr. Mejia then stated that he could not pick up the package that day because he was too busy. Mr. Mejia asked whether Airborne could just deliver the package for an extra charge, which he would pay. The caller answered that he could not do so, again, because the package was personal. At that point, Mr. Mejia asked where the package was from, to which the caller responded: "Caracas, Venezuela." Mr. Mejia then had a conversation off the phone, in which he asked his wife whether she was expecting a package from Venezuela. When his wife answered no, Mr. Mejia "went back to the phone and told the man and said, 'Are you sure it is coming from Venezuela?'" The caller answered yes. Mr. Mejia then asked the caller to describe the package. After a number of questions along that line, the caller said:

> "Look, this package, it was supposed— this package is supposed to be picked up few days going on, if you're not picking up the package, we are going to send it back and I'm going to get into trouble, because this package, I suppose [sic] to

---

**6.** In deposition, Mr. Mejia originally stated the first caller was named "Generale, something," but then he conceded that he was not sure and that he thought of Gennarelli's name "[m]aybe because I was every day at the court and when he testified, you know." (Luis Mejia Dep. at 90, 93.) Mr. Mejia then asserted that the first caller was in fact Bezmen, who also testified at the criminal trial. (*Id.* at 93.)

Finally, Mr. Mejia admitted that neither of the callers gave his name over the phone and that he only learned the names of Bezmen and Gennarelli through their testimony at trial. (*Id.* at 112–13.) Mr. Mejia stated that he could not tell by listening to them testify at trial whether theirs were the voices he heard on the phone. (*Id.* at 114–15, 347.)

send it out and I forgot to send it out. . . . So please come and pick it up . . . . [sic] Put it away for you and you just come and take out this package." Mr. Mejia then asked: "But where [sic] is the package?" The caller replied: "Looks like a Christmas present." Mr. Mejia again advised the caller: "Bring it to me and I will pay." The caller again stated that he could not do so because the package was already two days late and gave Mr. Mejia "a whole story about the package. Came through Miami also, the whole story." The caller added that the package would be sent back to Venezuela if he did not pick it up and again emphasized that it was a Christmas present.

Finally, Mr. Mejia stated that he "might pick it up later on," and asked for directions. At that point, Mr. Mejia and the caller had a conversation about the best route to take. The conversation ended with Mr. Mejia telling the caller that he would pick up the package, "[p]erhaps . . . today, I don't guarantee that."

Mr. Mejia testified that the call lasted over twenty to twenty-five minutes; later, he stated that it was probably even longer, between half an hour and forty-five minutes. At no time during the call, however, did the caller use his last name, Mejia.

The second alleged conversation occurred later on the afternoon of the 29th, around 2:30 p.m. or 3:00 p.m., when an unidentified, purported Airborne representative told Mr. Mejia: "We're waiting." Mr. Mejia replied: "I'm sorry, I forgot about it but I definitely [sic] pick it up

tomorrow." Mr. Mejia then hung up. Mr. Mejia believes the individual who made the second call was not the first caller.

Two more calls were allegedly made on November 30, 1993. The first came at about 9:30 or 10:00 a.m. Mr. Mejia believes this caller was the first caller from the day before. This caller asked: "Yes, what happened, you coming today?" Mr. Mejia responded: "I don't know. I think I will not be able to. Why don't you call me back later." With that, Mr. Mejia hung up.

The fourth call came that afternoon, at about 1:30 p.m. or 2:00 p.m. This caller, apparently the same one who had made the first and third calls, said: "Luis, you going to do me a favor or not, you picking up this package?" Mr. Mejia then states that he finally decided to go pick up the package because the caller convinced him it might be a Christmas present for his daughter.[7] Mr. Mejia asked the caller how he knew it was present. The caller explained that he had jiggled the box and heard bells inside.[8] Mr. Mejia then made additional inquiries regarding the description of the package. The caller ended by suggesting that he hurry over because the office was closing early.

Ultimately, Mr. Mejia relented and decided to pick up the package. According to Mr. Mejia, the only reason he did so was because his wife wanted to pick up some fresh chickens at a store that the last Airborne caller indicated was near the Airborne office.[9] So, he and his wife left the

---

7. When asked whether this was the first time he was told the package might be a Christmas present, Mr. Mejia answered, "Yes," thus contradicting his testimony that the Christmas present suggestion was made during the first call, the day before. (*Compare* Luis Mejia Dep. at 98 (account of first call), *with id.* at 172 (account of fourth call).)

8. Mr. Mejia later testified that the remark about the bells was made during the first conversation.

9. The exact location and identity of the store is unclear. Mrs. Mejia alternatively stated

that it was "F & D poultry, something like that BOG Poultry" on Sutphin Boulevard, (Luis Mejia Dep. at 66–67 (interjection by Mrs. Mejia)), or perhaps "D & F Poultry or P & B Poultry" on Liverpool or Merrick Street, (Aura Mejia Dep at 31, 33). At any rate, Mr. Mejia testified that the store was near the garage, (Luis Mejia Dep. at 66 (stating it was "very close" to garage); *but see* Aura Mejia Dep. at 32 (stating it was about 15 minutes away)), while JFK, which is located near the Airborne office, is about 15 to 20 minutes away by car, (Luis Mejia Dep. at 67–68).

garage for the Airborne office. Along the way, they got lost, and Mr. Mejia called for directions. A woman answered the phone and said: "Luis?" Mr. Mejia said "yes," and the woman gave him additional directions.

When he and his wife arrived at the Airborne facility, Mr. Mejia was met by S/A Tipton, who was wearing an Airborne uniform.[10] Mr. Mejia then signed for the package, and S/A Tipton released it to him.

Once he took possession of the package, Mr. Mejia went back to his car, opened up the package and took out one of the books. When he discovered it contained nothing but textile samples, Mr. Mejia decided it was "junk mail," threw the entire contents of the package into the back of his car, and drove off. According to Mrs. Mejia, she never touched the package or the enclosed books, and her husband did not rip open the bindings of any of the portfolios while they were in the car.

When asked at deposition why he did not return the package to Airborne, Mr. Mejia stated that he thought it might be for one of his employees, Javier Acevedo ("Acevedo"), who was allegedly from Medellin, Colombia. Mr. Mejia stated that Acevedo had been going through the mail at the garage and had been inquiring about a package from Colombia beginning about three weeks before the Mejias' arrests. The Mejias testified that, at the time of the arrests, another one of their employees and a roommate of Acevedo, Byron Benitez, was in Colombia. According to Mr. Mejia, Acevedo disappeared immediately after his and his wife's arrest.[11] Mr. Mejia, however, conceded in deposition that he "couldn't accuse [Javier]."

At any rate, about ten minutes after the Mejias left the Airborne facility, their car was stopped by police. A number of police officers approached the car with their guns drawn. Sergeant McNicholas banged on the car window with his gun. The Mejias were taken out of the car, and the police demanded that they produce the "drugs." In particular, Sergeant McNicholas said: "Where are the F drugs, you F Colombians, you are all the F same thing." The Mejias state that they did not know what the police officers were talking about. In addition, Mr. Mejia states that during the arrest, Detective Fox, who is not a defendant in this action, held a gun to his head and repeatedly said that he was going to "blow up [Mr. Mejia's] F head" if Mr. Mejia moved or looked around.

Sergeant McNicholas then frisked Mrs. Mejia, "kind of quick, rough, sort of thing," as she put it, though Mrs. Mejia acknowledged that she did not feel any pain or suffer injury as a result. Someone also asked Mrs. Mejia: "Bitch, tell me who this package was for." At some point, Sergeant McNicholas remarked: "Colombians, drug dealers from Columbia." In response, Mr. Mejia insisted that his wife knew nothing about any drugs, but the police officers, including Sergeant McNicholas, kept "picking on" her.

S/A Tipton was also on the scene.[12] S/A Tipton did not say anything to the Mejias during the arrest, other than to ask Mrs. Mejia whether she had children.[13] S/A Tipton did speak with Sergeant McNicho-

10. Mr. Mejia's testimony on this point contradicts that of Gennarelli and the other defendants, who state that it was Gennarelli who gave Mr. Mejia the package, see supra Background (2).

11. According to Mr. Mejia, Byron Benitez returned from Colombia in January, 1994, but quit his job at the garage less than one week later. (Luis Mejia Dep. at 46–47.)

12. Mr. Mejia testified that S/A Tipton was still dressed in an Airborne uniform at the time,

(Luis Mejia Dep. at 244–45), while his wife and S/A Tipton testified that she was not, (Aura Mejia Dep. at 78; Tipton Dep. at 99–100). Interestingly, Sergeant McNicholas stated that he did not remember whether S/A Tipton was wearing an Airborne uniform at the time. (McNicholas Dep. at 68.)

13. S/A Tipton conceded in deposition that she might have said something to Mrs. Mejia: "I could have. I just don't remember." (Tipton Dep. at 133.)

las at some point, after which he went to the back of the car and took the books from the backseat.

Mrs. Mejia then indicated to Sergeant McNicholas that similar textile books had been delivered to her and her husband's office on the previous day, November 29th.[14] As a result, Sergeant McNicholas, Detective Skinner, and Detective Fox took Mrs. Mejia back to the garage, where they seized the other books without advising her that she did not have to give her consent to the search.

The Mejias do not know whether the books were intact when the police seized them. The Mejias stated in deposition that they had opened the package containing the portfolios, but did not recognize what they were and so just left them sitting on top of a box in the garage's office.[15] The Mejias deny ripping the covers of any of the portfolios open. Mr. Mejia, however-

er, did not inspect the covers of the portfolios before he left for the Airborne office on November 30th; nor did Mrs. Mejia have an opportunity to do so when the police seized them from the office. Both of the Mejias testified that the door to the office was unlocked when they left to pick up the package.

After the search of the office, the police then took the Mejias to the 105th precinct. At the precinct, Mrs. Mejia, who was three months pregnant at the time, was told that she was "going to have the baby in jail, you're only going to have the baby for a year, and then the state is going to have the baby."[16] Sergeant McNicholas, specifically, told her: "You don't want to spend 7 to 15 years in jail. You wouldn't have your baby in jail." On Sergeant McNicholas's order, Mrs. Mejia was strip searched.

Mr. Mejia states that at the precinct, Detective Fox told him: "You Colombians

14. Mr. Mejia testified that, in addition to his wife's comment about the other portfolios, he told Detective Fox about the other portfolios in response to questioning on the subject. (Luis Mejia Dep. at 255.)

15. (Luis Mejia Dep. at 116, 130, 136, 148–50; Aura Mejia Dep. at 168–69.) The details of the Mejias' accounts of the delivery of the November 29th package and their response upon receiving it are interesting. The package was delivered "[b]y regular mailman. Not regular mailman, U.S. Mail." (Luis Mejia Dep. at 111.) The delivery man "very quietly went in," took this one package, and no other pieces of mail through the garage, through the stockroom, and into the back office, which "few people know about," where he placed it directly onto Mrs. Mejia's desk. (*Id.* at 117–18, 122.) Mr. Mejia "guess[es]" that he signed for it. (*Id.* 119.) No one but Mr. and Mrs. Mejia was in the garage when this happened. (*Id.* at 122.) Although he thought it odd that the delivery man seemed to know where his office was, Mr. Mejia did not say anything to the delivery man. (*Id.* at 118, 122.) Mr. Mejia stated that he had never seen this delivery man before, or since, the delivery man's uniform bore no emblem or insignia. (*Id.* at 118, 121; *see also* Aura Mejia Dep. at 36–37 (testifying that she has not seen this delivery man before or since).)

Despite the alleged fact that his employee Acevedo had been pestering him about a

package from Colombia for the preceding three weeks, (Luis Mejia Dep. at 45–46; *see also* Aura Mejia Dep. at 27–29 (testifying that Acevedo had told her more than once that he was expecting mail from Colombia in November)), when Mr. Mejia and his wife saw that "[the package] came from Colombia," they started "talking to each other, figure out who could be sending these books and who these books could be for or who for," (Luis Mejia Dep. at 126; *see also* Aura Mejia Dep. at 39–41 (recounting that her and husband questioned each other "Who could this be from or for, ..., we just talked about it makes no sense, ... what is this, that sort of thing")). Mr. Mejia asked his employee Diego whether he was expecting anything from Colombia, (Luis Mejia Dep. at 152), but did not ask Acevedo, who was working at the garage for four hours after the package arrived, as well as the next morning, (*id.* at 153–54).

16. Mrs. Mejia stated in deposition that Sergeant McNicholas had asked whether she was pregnant while they were at the scene of the arrest. (Aura Mejia Dep. at 82, 197.) When asked whether her belly was big at the time, Mrs. Mejia testified: "Not, really, no. You mean showing? ... I was wearing jeans and I had my jeans unbuttoned, if that would help some." (*Id.* at 70.) For his part, Sergeant McNicholas denies knowing that Mrs. Mejia was pregnant at the time. (McNicholas Dep. at 62.)

are all alike, garbage." Other officers also repeatedly made derogatory comments about his and his wife's Colombian nationality.

The only two officers, however, that the Mejias could identify as using abusive language were Sergeant McNicholas and Detective Fox. Neither of the Mejias allege that Detective Skinner engaged in any derogatory language. Indeed, Mr. Mejia stated that his only contact with Detective Skinner was at the scene of the arrest when Detective Skinner announced that he was the arresting officer. For her part, Mrs. Mejia stated that Detective Skinner did not say anything at all to her during the arrest.

### (4)

To explain why they might have thought that someone in Venezuela was sending them a Christmas present, the Mejias testified in deposition that about six months before their arrest, their former nanny, Nelly Betancour, had moved to Venezuela. There is no evidence that any of the defendants knew about the nanny, and, thus, there is no explanation of why the purported Airborne agents would have chosen to say that the package was from Venezuela as opposed to any other country besides Columbia.

Nonetheless, Mr. Mejia's account of the four telephone calls in which he was told the package was from Venezuela is corroborated by two salient pieces of physical evidence. The first is the Airborne airbill that was attached to the package when he picked it up from the Airborne office. Unlike the IBC airbill attached to the original packaging, which indicated the sender's address to be in Bogota, Columbia, the new Airborne airbill listed the sender's address simply as "Caracas." [17] None of the defendants claim responsibility for creating the Caracas airbill. [18]

The second piece of evidence is the Airborne box into which Detective Skinner placed the original package before the pickup. The exterior of the box carries a routing slip which indicates various airport codes. Pertinently, the section marked "ORIGIN" bears the notation "CAR," which appears to be an attempted reference to Caracas. [19]

17. There are other discrepancies between the two airbills. Whereas the original IBC airbill did not list an individual addressee, the Airborne airbill reads "Hold for Luis" in a section for the receiver's address marked "ATTN (NAME/DEPT)." The name "Luis," along with certain illegible letters, also appears in a section marked "RECEIVER'S AIRBORNE EXPRESS ACCOUNT NO." Finally, whereas the IBC airbill listed the sender's name as "GABRIEL JARAMILLO LARA," the section of the Airborne airbill marked "SENT BY (NAME/DEPT)" reads "NONE."

18. The only individual who admitted that he recognized the new airbill was Detective Skinner. Detective Skinner stated that the new airbill had already been prepared by someone else when he was repackaging the portfolios at the Airborne office and that he did nothing more than place the airbill into the plastic sleeve on the face of the Airborne box. (Skinner Dep. at 39.) Detective Skinner did not indicate who gave him the new airbill and stated that he did not recognize the handwriting on it. (*Id.* at 39–40.)

Gennarelli gave apparently conflicting testimony on the existence of the new airbill. At one point in deposition, he stated that the package had a "label" on it when he gave it to Mr. Mejia, (Gennarelli Dep. at 43–44), but later stated that he did not know whether the package had anything on it that would indicate who the addressee was when Mr. Mejia took it, (*id.* at 68–69, 72).

It should also be noted for clarity that Gennarelli stated in deposition that he created a manifest for "Luis" to sign when he arrived, so that Airborne's actual manifest for that day would not be taken into evidence and could be retained for Airborne's business records. (*Id.* at 46–47.) This manifest, however, is a separate document, distinct from the airbill, and does not indicate the origin of the package. (*Compare* Pl.'s Ex. N (airbill), *with id.* Ex. O (manifest).)

19. CAR is, in fact, the airport code for Caribou Municipal Airport in Caribou, Maine. *See Airport and City Code Database for 9,000 Airports Worldwide* (visited Sept. 24, 2000) <http://www.airportcitycodes.com/aaa>; *International Airport Codes* (visited Sept. 24, 2000) <http://www.my.bawue.de/stereo/airportcodes.html>. The correct code for Caracas's international airport is CCS, while that for Bogota is BOG. *See id.*

Although Gennarelli initially denied playing any role in the repackaging of the shipment other than bringing Detective Skinner a box and some tape and stated that he was not even in the room at the time, he admitted later in his deposition that he filled out the entire routing slip, including the designation of CAR as the origin.[20] When asked what "CAR" stands for, Gennarelli replied: "Just initials." Gennarelli further stated that he did not remember who, if anyone, told him to put CAR on the package, and did not know what it meant.[21] Although Gennarelli admitted that S/A Tipton told him to put a particular airbill number on the routing slip, he denied that S/A Tipton or anyone else had told him that the package originated in Caracas. Gennarelli further denied that anyone had instructed him to tell Mr. Mejia that the package was from Caracas. Notably, S/A Tipton and Detective Skinner were together in the room where the shipment was being repackaging throughout the time it was being repackaged, and Sergeant McNicholas entered the room when Detective Skinner was finishing taping the box.

Finally, two aspects of Mr. Mejia's account of the four calls and their content are corroborated by testimony of certain of the defendants. First, whereas Gennarelli does not recount having to give "Luis" any reasons why he had to come to Airborne to pick up the package and testified that "Luis" readily agreed to do so, S/A Tipton's notes indicate that Gennarelli had given "Luis" "several reasons [why it] could not be delivered," though she could not recall what those "several reasons were."

Second, Mr. Mejia's account that he received more than one telephone call from a purported Airborne agent is corroborated by Detective Skinner's deposition testimony. Although defendants have represented in their motion papers that the only call placed to Mr. Mejia was Gennarelli's call on November 29th, Detective Skinner testified that on November 30th, after finishing the repackaging of the portfolios, "[w]e sat around, conversated [sic], eventually, I believe, someone, I don't know who it was, I don't remember who it was, said 'I'm going to attempt to call this person again.'" Detective Skinner stated that Mr. Mejia arrived a "short time later." Based on Detective Skinner's daily activity report, which puts the time of Mr. Mejia's arrival at 2:45 p.m., this unidentified individual's call appears to coincide with Mr. Mejia's estimate that he received a fourth call from a purported Airborne agent at around 1:30 p.m. to 2:00 p.m. on the 30th.

### (5)

The events subsequent to the arrest are not in dispute. After the arrest, Detective Skinner swore out an arrest affidavit charging the Mejias with Criminal Possession of a Controlled Substance in the First

---

The routing slip also lists MIA as the "ABX SORT"—ABX is an abbreviation for Airborne Express, (see Bezmen Dep. at 5). MIA is the airport code for Miami International Airport. *See Airport and City Code Database, supra; International Airport Codes, supra.* Notably, Airborne takes custody of parcels that originate from associated South American courier services, such as IBC, in Miami, and, of course, Miami was the actual connecting airport for the package in this case.

Finally, the routing slip lists LIQ as the "DESTINATION." While the code LIQ is suggestive of Long Island, it is in fact the code for Lisala, Zaire. *See id.*

20. Gennarelli's initial denial that he played any active role in repackaging the portfolios is further contradicted by Detective Skinner's testimony. Detective Skinner testified that he had tried to tape up the box but that his attempt did not look very professional. (Skinner Dep. at 36–37.) He, therefore, asked "Gennarelli or someone else from Airborne" to assist him with taping the box, which that person did. (*Id.* at 37.)

21. Gennarelli was also ambivalent when asked what "MIA" stood for. Initially, Gennarelli stated that the letters were also "just initials" and had no significance of any kind, and that he did not know why he chose them. (Gennarelli Dep. at 60.) After being shown his testimony at Mr. Mejia's criminal trial, however, Gennarelli grudgingly admitted that it was a code for Miami. (*Id.* at 61–62.)

Degree, in violation of New York Penal Law § 220.21. Mrs. Mejia was released on bail the next day, and Mr. Mejia was released on bail three days later.

Thereafter, state grand juries were convened.[22] Mrs. Mejia was not indicted, but Mr. Mejia was. Mr. Mejia was tried in the New York Supreme Court for Queens County, and was acquitted on March 20, 1995.[23]

On March 18, 1996, the Mejias served a notice of claim on the City, alleging false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress ("IIED").

On June 17, 1996, the Mejias commenced this action, asserting: (1) causes of action under § 1983 against S/A Tipton, Sergeant McNicholas, Detective Skinner, and Airborne, for false arrest, excessive force, and malicious prosecution; (2) state law causes of action for false arrest, false imprisonment, and IIED, against Sergeant McNicholas, Detective Skinner, and the City; and (3) state law causes of action for malicious prosecution and IIED against Airborne.

Each of the defendants, except for the City, now moves for summary judgment on the grounds that probable cause existed for the arrest and prosecution, and, in the alternative, that they are entitled to qualified immunity. The City moves on the grounds that it cannot be held vicariously liable under § 1983 for its officers' actions and that the Mejias' notice of claim and complaint were untimely.

## Discussion

Certain basic principles of law apply equally to each of the defendants and will, therefore, be reviewed at the outset. Separate analyses of the application of these principles to each of the defendants will follow.

### (1)

### Applicable Law

**A. False Arrest under § 1983 and New York Law**

 Under New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995) (citing *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975)).[24] Moreover, a " § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst,* 101 845, 852 (2d Cir.1996). Therefore, the elements of a cause of action for false arrest under both 42 U.S.C. § 1983 and New York law are: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Singer,* 63 F.3d at 118 (quoting *Broughton,* 37 N.Y.2d at 456, 373 N.Y.S.2d at 93, 335 N.E.2d 310).

 Where, as here, an arrest is made without a warrant, the existence of probable cause is an affirmative defense that must proved by the defendant. *See Broughton,* 37 N.Y.2d at 458, 373 N.Y.S.2d

---

**22.** Detective Skinner and S/A Tipton testified at the grand jury, but Sergeant McNicholas, Gennarelli, and Bezmen did not.

**23.** S/A Tipton, Detective Skinner, Sergeant McNicholas, Bezmen, and Gennarelli all testified at the trial.

Notably, the jury never learned of the additional portfolios because they were suppressed by the trial judge on the ground that

Mrs. Mejia's consent to search the Mejias' office had not been given voluntarily. *See People v. Mejia,* Indict. No. N13203–93 (N.Y. Sup.Ct., Queens County Feb. 6, 1995) (transcript of *Mapp* hearing at 146–47).

**24.** Accordingly, for brevity's sake, plaintiffs' state law claims for false arrest and false imprisonment will, henceforth, be referred to simply as "false arrest" claims.

at 95, 335 N.E.2d 310; *see also Weyant,* 101 F.3d at 852 (holding that "existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest' " (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994))). Probable cause, or reasonable cause as it is known in New York law, "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person about to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852 (citations omitted); *see Raysor v. Port Auth. of N.Y. & N.J.,* 768 F.2d 34, 39–40 (2d Cir.1985) (holding that New York law "reasonable cause" standard is equivalent to Fourth Amendment's "probable cause" standard). Since the law seeks to protect citizens against unlawful arrest, the determination of whether probable cause existed must be made on the basis of the information possessed or reasonably available to the defendant at the time of the arrest. *See Lowth v. Town of Cheektowaga,* 82 F.3d 563, 570 (2d Cir.1996). It is, therefore, axiomatic that subsequently discovered evidence cannot be used to cure an arrest that was made without probable cause. *Cf. People v. Gomcin,* 265 A.D.2d 493, 495, 697 N.Y.S.2d 93, 95 (2d Dep't 1999) (search incident to arrest) ("[I]t is beyond cavil that the fruit of a search incident to an arrest cannot be used to establish probable

cause to arrest."); *cf. also Johnson v. United States,* 333 U.S. 10, 16–17, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948) (holding that reasoning which would "justify the arrest by the search and at the same time justify the search by the arrest . . . will not do").[25]

## B. Malicious Prosecution under § 1983 and New York Law

■■ To establish a claim for malicious prosecution under New York law, a plaintiff must show: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Broughton,* 37 N.Y.2d at 457, 373 N.Y.S.2d at 94, 335 N.E.2d 310 (citation omitted). On a motion for summary judgment, malice may be inferred from evidence showing a lack of probable cause. *See Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994) (citing *Maxwell v. City of New York,* 156 A.D.2d 28, 34–35, 554 N.Y.S.2d 502, 505–06 (1st Dep't 1990)).

■■ In order to establish a claim for malicious prosecution under § 1983, a plaintiff must show: (1) that elements of the common law tort of malicious prosecution are satisfied; and (2) that the malicious prosecution led to a deprivation of liberty sufficient to constitute a "seizure" within the meaning of the Fourth Amendment, or must otherwise establish that the malicious prosecution violated a right, priv-

---

**25.** *United States v. Valez,* 796 F.2d 24 (2d Cir.1986), is not, as S/A Tipton argues, to the contrary. In *Valez,* a police officer was searching for a participant in an observed drug transaction based on a detailed description of the suspect. The officer arrested Valez on the basis of his fitting the description and the fact that he was in the immediate area of the transaction shortly after the transaction. Unbeknownst to the arresting officer, another officer had, a short time earlier, arrested the intended suspect. However, after Valez was taken out of the arresting officer's car at the police station, 15 packets of cocaine were found under his seat. The Second Circuit indicated that these packets of cocaine "provided independent probable cause to support Valez's arrest." *Id.* at 26.

S/A Tipton argues that *Valez,* therefore, supports the proposition that evidence discovered after an arrest can provide probable cause for the arrest. However, earlier in its opinion, the Second Circuit held that the fact that Valez matched the suspect's description gave the arresting officer probable cause at the time of the arrest. *See id.* at 26. Thus, there was no defect in the original arrest that required cure. In context, then, it is clear that the Second Circuit's holding was that the discovery of the cocaine packets provided probable cause to *continue* holding Valez, even after the arresting officer became aware of the intended suspect's arrest.

ilege, or immunity secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983; *Singer,* 63 F.3d at 116 & n. 5.[26]

The probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim, and the two determinations play different roles in the two causes of action. First, in a malicious prosecution action, the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced. *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999). This determination is distinct from the question of whether there was probable cause for the arrest, though a lack of probable cause to believe the plaintiff committed the crime in question necessarily entails a lack of probable cause to commence a proceeding against him or her. *See id.*

Second, in a malicious prosecution action, the lack of probable cause is an element of the tort that must be pled and proved by the plaintiff. *See Broughton,* 37 N.Y.2d at 457, 373 N.Y.S.2d at 94, 335 N.E.2d 310.

Finally, the existence, or lack, of probable cause is measured at a different point in time in a malicious prosecution action than a false arrest action, where the prosecution follows a warrantless arrest. This is because a warrantless arrest is an extrajudicial proceeding. *See id.* at 458, 373 N.Y.S.2d at 94, 335 N.E.2d 310. In such cases, the judicial proceeding is not deemed to have been commenced until the plaintiff's arraignment or an indictment by a grand jury. *See id.* at 457, 373 N.Y.S.2d at 94, 335 N.E.2d 310. Accordingly, the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest. *See* 59 N.Y. Jur.2d *False Imprisonment & Malicious Prosecution* § 73 (1987) ("Whether probable cause existed depends upon whether a reasonably prudent person would have believed the plaintiff guilty of the crime charged on the basis of the facts known to the defendant *at the time the prosecution was initiated* or which he then reasonably believed to be true." (emphasis added)). Thus, information discovered by a malicious prosecution defendant after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause in cases where the prosecution follows a warrantless arrest.

This distinction between the time at which probable cause is measured in a false arrest action and in a malicious prosecution action takes on some significance in this case, because several pieces of (at least potentially) inculpatory evidence were discovered between the Mejias' arrest and the commencement of judicial proceedings against them, viz., the three similar portfolios seized from their office.[27]

## C. Qualified Immunity

Even where probable cause is lacking, a law enforcement officer in a

---

**26.** With regard to the latter showing, plaintiffs' "arrest cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not 'pursuant to legal process,' " i.e., not one that arose from malicious prosecution as opposed to false arrest. *Singer,* 63 F.3d at 116. Plaintiffs' release on bail after arraignment might constitute a Fourth Amendment "seizure," *see id.,* but there is no evidence before the court as to whether their bail conditions restricted their ability to travel freely. However, because defendants have not raised the issue in their motion papers and there is no record on the question at this time, the determination of whether plaintiffs suffered an injury of constitutional proportions as a result of the alleged malicious prosecution must await trial.

**27.** The three subsequently seized portfolios are admissible in this action as evidence of probable cause, despite the fact that they were suppressed during Mr. Mejia's criminal trial, *see supra* note 23, because the Fourth Amendment's exclusionary rule does not apply in civil actions other than civil forfeiture proceedings. *See Pennsylvania Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 363, 118 S.Ct. 2014, 2019, 141 L.Ed.2d 344 (1998)

§ 1983 action for false arrest or malicious prosecution may, under the doctrine of qualified immunity, affirmatively defend on the ground that it was "objectively reasonable" for an officer in his or her position to believe that probable cause existed. *Weyant*, 101 F.3d at 857–58 (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)). The objective reasonableness of an officer's belief that probable cause existed turns on "whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the . . . officer[ ] possessed" at the relevant time. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040. The relevant time for the purposes of a false arrest action is the time of the arrest; and the relevant time for purposes of a malicious prosecution action is the time that the criminal proceeding was commenced. The purpose of the qualified immunity doctrine in this context is to protect law enforcement officials from liability for reasonable errors of judgment. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

With these principles in mind, an examination of plaintiffs' various claims against each particular defendant may begin.

### (2)

### City of New York

**A. Any implicit § 1983 respondeat superior claims plaintiffs may be making must be dismissed.**

Plaintiffs' complaint does not expressly assert any § 1983 claims against the City.

(holding that exclusionary rule does not extend to proceedings other than criminal trials); *One 1958 Plymouth Sedan v. Com. of Pennsylvania*, 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965) (holding that exclusionary rule does apply to civil forfeiture proceedings); *cf. United States v. Janis*, 428 U.S. 433, 454, 96 S.Ct. 3021, 3032, 49 L.Ed.2d 1046 (1976) (holding that exclusionary rule does not extend to forbid the use in

(*See* Compl. ¶ 25.) Nonetheless, the City has moved for summary judgment on the issue, and to the extent plaintiffs are implicitly making a § 1983 claim against it, the issue will be addressed and decided.

■ As the City notes, in *Monell v. Department of Social Services*, the Supreme Court held that a municipality cannot be held vicariously liable under § 1983 for constitutional torts committed by its employees. *See* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Instead, a municipality can only be held liable if the constitutional violation of which a plaintiff complains resulted from an official custom, policy, practice, or . usage of the municipality. *See id.* at 690–91, 98 S.Ct. at 2035–36. Plaintiffs have produced no evidence that any of the alleged constitutional violations committed in the course of their arrest and prosecution stemmed from any policy, practice or custom of the City. Accordingly, the City's motion for summary judgment on plaintiffs' § 1983 claims against it, if any, is granted.

**B. Plaintiffs' state law respondeat superior claims must be dismissed.**

■ The City correctly argues that plaintiffs' state law respondeat superior claims against it must be dismissed for failure to comply with a condition precedent. In cases where a plaintiff seeks to sue a municipality for torts arising out of the conduct of police officers in the course of their employment with the municipality, New York General Municipal Law §§ 50–e and 50–i require that a plaintiff file a notice of claim within ninety days after the

federal civil tax proceeding of evidence illegally seized by state criminal law enforcement agent). This is because the deterrent purposes of the exclusionary rule have already been satisfied by the exclusion of the evidence from Mr. Mejia's criminal trial. *See Townes*, 176 F.3d 138, 146 (2d Cir.1999) (declining to extend exclusionary rule to § 1983 suit for, inter alia, false arrest and malicious prosecution).

accrual of the causes of action on which the claim is based. Here, plaintiffs did not file a notice of claim against the City until March 18, 1996, which is more than ninety days after the accrual of the last-accruing cause of action they have pled (viz., March 20, 1995, the date on which Mr. Mejia's malicious prosecution claim accrued as a result of his acquittal, *see Scomello v. Caronia,* 232 A.D.2d 625, 625, 648 N.Y.S.2d 688, 689 (2d Dep't 1996)). Accordingly, the City's motion for summary judgment on plaintiffs' state law claims is also granted.

### (3)

### Airborne

**A. Plaintiffs' § 1983 false arrest and malicious prosecution claims present issues for the jury.**

 As an initial matter, it is noted that "[p]rivate persons, jointly engaged with state officials in [a] prohibited action, are acting 'under color' of law for purposes of [§ 1983]," *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966), and Airborne does not contest its state actor status in this case. Instead, Airborne argues that plaintiffs' § 1983 claims against it should be dismissed because (1) it had probable cause for the Mejias' arrest, and (2) even if it did not, it is entitled to qualified immunity. Each argument is considered in turn below.

### 1. Probable Cause

In order to establish that it had probable cause, Airborne attempts to enlists the aid of two presumptions: first, that the grand jury indictment of Mr. Mejia creates a presumption of probable cause; and (2) that Mrs. Mejia's presence in a vehicle in which a controlled substance was found creates a statutory presumption that she knowingly possessed the controlled substance, *see* N.Y. Penal Law § 220.25 (providing, with limited exceptions, that "presence of a controlled sub-

stance in an automobile, other than a public omnibus, is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time such controlled substance was found").

 Neither presumption avails. First, the presumption created by Mr. Mejia's grand jury indictment has no application to false arrest claims, but only to malicious prosecution claims. *See Broughton,* 37 N.Y.2d at 456, 373 N.Y.S.2d at 93–93, 335 N.E.2d 310. Moreover, with respect to the malicious prosecution claim, the presumption created by the grand jury indictment may be rebutted where there is evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police or other police conduct undertaken in bad faith. *See Marshall v. Sullivan,* 105 F.3d 47, 54 (2d Cir. 1996); *Colon v. City of New York,* 60 N.Y.2d 78, 82–83, 468 N.Y.S.2d 453, 455–56, 455 N.E.2d 1248 (1983). To the extent that an indictment was obtained against Mr. Mejia based on the defendants' alleged misrepresentations regarding the exchange of calls between Airborne and Mr. Mejia, plaintiffs have produced evidence of fraud, suppression of evidence, and police misconduct sufficient to rebut the presumption that there was probable cause for his prosecution.

 Second, the presumption created by New York Penal Law § 220.25 is "evidentiary" in nature and may be rebutted "by defendant's own testimony or by any other evidence in the case, including the inherent or developed incredibility of the prosecution's own witnesses." *People v. Leyva,* 38 N.Y.2d 160, 167, 379 N.Y.S.2d 30, 36, 341 N.E.2d 546 (1975). If Mr. Mejia's account of the four calls is true, then a jury could find that the Mejias' were not the intended recipients of the package, did not know it contained cocaine, and only went to the Airborne office to claim the package because of misrepresentations concerning its origin. In those cir-

cumstances, the presence of the package in the Mejias' car would not, contrary to the statutory presumption, constitute evidence that Mrs. Mejia knowingly possessed the cocaine within the package. Thus, neither of the presumptions of probable cause relied upon by Airborne apply in this case.

It is, therefore, necessary to examine whether probable cause in fact existed to believe that Mejias were the intended recipients of the package and, hence, guilty of criminal possession of a controlled substance. As noted above, the existence of probable cause must be measured at two different points in time in this case: viz., at the time of the arrest for the false arrest claim, and at the time of the commencement of criminal proceedings for the malicious prosecution claim. *See supra* Discussion (1)(A)-(B). Viewing the evidence on this motion for summary judgment in the light most favorable to the Mejias and drawing all reasonable inferences in their favor, *see Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000), probable cause did not exist for their arrest or the commencement of proceedings against them.

### a. Probable cause at the time of the arrest.

■ A person is guilty of violation of New York Penal Law § 220.21 only if he or she knowingly possesses the controlled substance. *See* N.Y. Penal Law § 220.21; *People v. Cifuentes*, 259 A.D.2d 558, 559, 686 N.Y.S.2d 437, 438 (2d Dep't 1999). There is no question that the Mejias possessed the package containing the cocaine

28. Mr. Mejia's account of the alleged phone call to his employee, Charlie Diego, in which an unidentified individual asked for the owner's name and asked whether the owner was Colombian, is inadmissible hearsay and cannot be considered on this motion for summary judgment. *See* Fed. R.Civ.P. 56(e) (providing that summary judgment must be opposed by "such facts as would be admissible in evidence").

29. Admittedly, this inference is weak in light of the fact that the Mejias have provided no explanation of why Airborne's Bezmen would

after the pickup. The only question, then, is whether they did so knowingly.

### i. Mr. Mejia

■ Arguably, Bezmen's alleged discovery that "Luis" had called Airborne to inquire about the package would, at that point in time, have given the defendants probable cause to believe that any "Luis" who came to claim the package was its intended recipient and, thus, was aware of its contents. The Mejias speculate that there never was such a call and point to the fact that defendants have been unable to provide documentary evidence of the alleged Airborne computer entry, *see supra* note 1, and to Mr. Mejia's denial that he placed a call to Airborne inquiring about the package. However, Mr. Mejia's denial is consistent with the possibility that someone else called Airborne and gave the name "Luis" in order to disguise his true identity. As an alternative explanation of how the law enforcement defendants obtained the name "Luis," the Mejias point to the fact that S/A Raffa obtained a business card from Complete Diagnostic on November 19, 1993 that bore the name "Luis." [28] Based on this fact and the lack of documentary evidence of the Airborne computer entry, a reasonable juror could infer that there never was a call to Airborne from "Luis," in which case probable cause was certainly lacking when defendants began to make arrangements for their second attempt at a controlled delivery on November 29, 1993.[29]

Moreover, even if there was such a call, a reasonable juror could find that subse-

vouch for the existence of such a call on behalf of the other defendants. (*See, e.g.,* Luis Mejia Dep. at 351 ("I don't know what was going on between them and Brenda Tipton. For all I know, they were having an affair. Who, God knows what was going on.").) Still, the weakness of the inference that there was no call from "Luis" to Airborne is ultimately immaterial, for, as detailed below, a reasonable juror could conclude that probable cause was lacking at the time of the arrest even if there was such a call.

quent events dissipated any probable cause that it may have created with respect to Mr. Mejia and, hence, Mrs. Mejia. *See Lowth*, 82 F.3d at 571 (holding that probable cause may dissipate if "the groundless nature of the charges [becomes] apparent by the discovery of some intervening fact" (citing *Callan v. State*, 73 N.Y.2d 731, 535 N.Y.S.2d 590, 532 N.E.2d 96 (1988))). Assuming, as the court must, that Mr. Mejia's account of the four calls regarding the package's Venezuelan origin and his reluctance to claim it is true, then no "person of reasonable caution," *Weyant*, 101 F.3d at 852, who was aware of the content of those four calls would be warranted in the belief that Mr. Mejia was the "Luis" who had called to inquire about the package from Colombia. Pertinently, there is sufficient evidence for a reasonable juror to conclude that Airborne's employees were so aware and, thus, that Airborne knowingly participated in the ruse.

Mr. Mejia testified that he received four telephone calls from individuals who identified themselves as Airborne representatives who implored him to claim a package that they represented to be from Venezuela. As detailed above, *supra* Background (4), Mr. Mejia's account of the four telephone calls is corroborated by: (1) two salient pieces of physical evidence, viz., the phony airbill that indicates the origin of the package to be Caracas, and the routing slip on the exterior of the Airborne box, which designates "CAR" as the package's origin, (Pl.'s Ex. N.); (2) S/A Tipton's testimony that Gennarelli gave "Luis" "several [unspecified] reasons" why the package could not be delivered, (Tipton Dep. at 119, 121–22); and (3) Detective Skinner's testimony that, on the afternoon of November 30th, "someone" at the Airborne office stated he was going to place a call to "this person again," (Skinner Dep. at 37). If a reasonable juror credited Mr. Mejia's account of the four telephone calls, then he or she could infer that Gennarelli's account of his telephone conversation with Mr. Mejia on November 29th was false and that Airborne did participate in making the al-

leged misrepresentations concerning the package's Venezuelan origin to Mr. Mejia. Moreover, Gennarelli's own admission that he wrote the notation "CAR" on the routing slip and his failure to provide any explanation as to why he did so, (Gennarelli Dep. at 57, 59–60, 62–63), provide persuasive evidence of Airborne's involvement in the alleged ruse.

Of course, Airborne's participation in the ruse would not defeat a finding that they had probable cause if Airborne believed that the package was from Venezuela. However, there is circumstantial evidence upon which a reasonable juror could find that Airborne knew or learned from law enforcement that the package was in fact from Bogota, Colombia. First, on and before November 30th, Bezmen and Gennarelli had several conversations with S/A Tipton (who knew the package was from Colombia) and with one another regarding the controlled delivery of the package. A reasonable juror could infer that the origin of the package was mentioned at some point in these conversations. Second, Bezmen had reviewed Airborne's own computerized tracking records related to the package in the course of the investigation, (Bezmen Dep. at 40, 42), and these records may have indicated that the package originated in Colombia.

Thus, a reasonable juror could find, on the evidence presented, that Airborne participated in deceiving Mr. Mejia into believing that he was claiming a package from Venezuela, when it knew that the package was from Colombia. In those circumstances, Airborne would not have probable cause to believe that the Mr. Mejia was the intended recipient of the package.

#### ii. Mrs. Mejia

Airborne also argues that probable cause was created by Detective Skinner's observation that the portfolios were in Mrs. Mejia's lap when he approached the car and his subsequent discovery that the

cover of one of the portfolios had been ripped open. However, Mrs. Mejia has denied that she even touched the portfolios, much less ripped one of them open. Instead, the Mejias testified that Mr. Mejia had simply opened the package, looked at one of the portfolios, decided it was "junk mail," and then tossed the package and its contents onto the floor in the back of the car. Moreover, there are inconsistencies in Detective Skinner's testimony on this point. Before the grand jury, he testified that one of the portfolios was open and he could already see what appeared to be cocaine when he first approached the car. But in his deposition, Detective Skinner testified that the portfolios were merely sitting on Mrs. Mejia's lap and that it was only on subsequent inspection that he discovered one of them had been ripped open. Finally, S/A Tipton testified that one of the portfolios had already been "ripped open," not merely punctured, by Miami Customs officials and that the cocaine pouch was visible when she received the package from Miami. *See supra* note 3. Notably, Detective Skinner testified in deposition that he closely examined the portfolios when he was repackaging them and that S/A Tipton had pointed out to him the "hole" caused by the field-test in Miami. Thus, a reasonable juror could find that the portfolios were not on Mrs. Mejia's lap when the car was stopped, and that Detective Skinner knew that one of the portfolios had already been ripped open before Mr. Mejia claimed the package. Under those circumstances, the location and condition of the portfolios in the Mejias' car would not create probable cause to believe they were aware of the package's contents.

**b. Probable cause at the time criminal proceedings were commenced against the Mejias.**

■■ The determination of whether a particular defendant had probable cause must be made on the basis of the information possessed by, or reasonably available to, that defendant. *See* 59 N.Y. Jur.2d

*False Imprisonment & Malicious Prosecution* § 71 (1987). In this case, there is no evidence that at the time criminal proceedings were commenced, any Airborne employee was aware of the seizure of the additional portfolios from the Mejias' office. Moreover, even if the police defendants' knowledge of the additional portfolios can be imputed to Airborne, *cf. Davis v. Little,* 851 F.2d 605, 607 (2d Cir.1988) (holding that probable cause may be determined on basis of collective knowledge of police), that additional evidence would still not be enough to preclude a reasonable juror from finding that Airborne lacked probable cause.

Whether the additional portfolios created probable cause (and with respect to which of the plaintiffs) depends on the condition they were in when the police seized them. On this question, there is conflicting evidence. The police defendants testified that the covers of each of the portfolios had been ripped open, thus suggesting that they had also contained cocaine and that the Mr. Mejia (or much less likely Mrs. Mejia in view of the fact that she alerted the police defendants to their existence) had removed it. In contrast, the Mejias deny that they ripped open the portfolios. Mr. Mejia testified that, before he left for the Airborne office on November 30th, the portfolios were in still in the same place he had left them, and Mrs. Mejia testified that they were still in the same spot when she returned to the garage with the police. Mrs. Mejia admitted, however, she did not have an opportunity to inspect the condition of the portfolios at the time the police seized them.

■ While the Mejias' testimony does not directly contradict that of the police defendants since it is possible that someone may have entered the Mejias' unlocked office during the one and one-half to two hours after they left for the Airborne office, removed any cocaine that may have been in the portfolios, and carefully placed

them back in their original position, the police defendants' testimony that the portfolios had been ripped open before they were seized cannot be credited on this motion for summary judgment. As the Second Circuit has noted, a witness's " 'disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements.' " *United States v. Weinstein*, 452 F.2d 704, 713 (2d Cir.1971) (Friendly, C.J.) (quoting *Knowles v. People*, 15 Mich. 408, 412 (1867)). A reasonable juror could discredit the police defendants' testimony as to their actions in arranging the controlled pickup, *see infra* Discussion (5)(A)(1), (6)(A)(1), as well as other inculpatory observations to which they have testified, and which the Mejias have denied, e.g., that Mrs. Mejia handled the portfolios or that Mr. Mejia got out of his car and said, "What is this for, the drugs?" Thus, a reasonable juror could also discredit the police defendants' testimony that the additional portfolios had been opened.

Therefore, viewing the evidence in the light most favorable to the Mejias and drawing all reasonable inferences in their favor, what the police defendants seized were (1) similar portfolios from a similar address in Bogota, Colombia, (2) which had not been opened by the Mejias, (3) which had been left in plain view on top of a box, rather than secreted away, and (4) which Mrs. Mejia, against the penal interests of her and her husband, had spontaneously offered to the police.[30]

In light of Airborne's assumed knowledge of the deception required to induce Mr. Mejia to claim the first set of portfolios, the discovery of these additional, unopened portfolios in the Mejias' office would not warrant a person of reasonable caution to believe that the Mejias were the intended recipients of the first set of portfolios. A fortiori, a person of reasonable

caution would not be warranted in believing that criminal proceedings could be successfully commenced against them on this basis. *See Posr*, 180 F.3d at 417. At most, the additional portfolios would be evidence of an ongoing effort to smuggle drugs through the Mejias' garage, which Sergeant McNicholas knew employed several individuals, any one of whom could have been the intended recipient. Thus, even assuming Airborne can be imputed knowledge of the additional portfolios—which is by no means clear, a reasonable juror could find that Airborne did not have the requisite probable cause at the time criminal proceedings were commenced against the Mejias.

### 2. Qualified Immunity

■ The basic test for determining whether a public official is entitled to assert qualified immunity was established by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When the defendant is a private actor, however, a court must first determine whether qualified immunity is even available to the defendant. This is because "private actors are not automatically immune (i.e., § 1983 immunity does not automatically follow § 1983 liability)." *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 2108, 138 L.Ed.2d 540 (1997). The discussion below will, therefore, proceed in two stages: first, it will be considered whether qualified immunity is even available to private actors in Airborne's position with respect to either the false arrest or malicious prosecution claims; and, if so, whether Airborne is entitled to qualified immunity in light of the evidence presented in this case.

### a. Qualified Immunity for False Arrest

### i. Is qualified immunity available to private actors in Airborne's position?

■ In deciding whether a private actor is entitled to assert qualified immunity

---

**30.** *See supra* note 5 and accompanying text.

under § 1983, the Supreme Court has held that a court must look first to whether "[h]istory ... reveal[s] [that] a 'firmly rooted tradition' of immunity [is] applicable" to the class of private actors involved in the case, *Richardson*, 521 U.S. at 404, 117 S.Ct. at 2104, and, second, to "[w]hether the immunity doctrine's purposes warrant immunity" for that type of private actor, *id.* at 407, 117 S.Ct. at 2105. The first inquiry entails an examination of whether the "parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871— § 1 of which is codified at 42 U.S.C. § 1983," *Wyatt v. Cole*, 504 U.S. 158, 164, 112 S.Ct. 1827, 1831, 118 L.Ed.2d 504 (1992), and the second, an examination of whether the policy reasons that support granting qualified immunity to public officials apply to the relevant class of private actors, *see Richardson*, 521 U.S. at 407–12, 117 S.Ct. at 2105–07.

 To conduct these inquiries properly, it is essential first to describe correctly the relevant class of private actors. *See Murphy v. New York Racing Ass'n, Inc.*, 76 F.Supp.2d 489, 505–06 (S.D.N.Y. 1999). Airborne argues that, as a courier service, its activities are analogous to those of the U.S. Postal Service, and that the court's inquiry should, therefore, focus on the same considerations that would apply in determining whether immunity is available to the government mail service. Airborne, however, is not being sued in this case for its activities in delivering mail. Rather, plaintiffs have sued Airborne for being a private actor enlisted by law enforcement to make an allegedly unlawful arrest. It is this latter, functional description of Airborne's role in the circumstances that precipitated this action that defines the relevant class of private actors for the purposes of determining whether qualified immunity is available to Airborne. *Cf. id.* (holding, in § 1983 action against board of directors of state racing commission, that availability of qualified immunity would be determined on basis of board members' status as corporate officers, not their status as "parties engaged in horse racing").[31]

Although it is presumably common place for private citizens to assist law enforcement in making arrests, the question of whether qualified immunity is available to such persons turns out to be surprisingly novel. No court in this circuit has addressed the issue, and the few decisions from courts in other circuits that have addressed similar questions, were decided before *Richardson* or else do not conduct the historical inquiry required by *Richardson*.[32] It is, therefore, necessary to start

---

31. Airborne's characterization of its status as that of a mail carrier similar to the U.S. Postal Service would, in any event, not be availing in its bid for immunity. *Cf. Richardson*, 521 U.S. at 408, 117 S.Ct. at 2106 (rejecting defendant's argument that "[s]ince private prison guards perform the same work as state prison guards, ..., they must require immunity to a similar degree"); *cf. also id.* at 409, 117 S.Ct. at 2106 (stating that approach based on primary activity of private defendants "bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even *mail delivery*" (emphasis added)).

32. *Cf. Warner v. Grand County*, 57 F.3d 962, 965–67 (10th Cir.1995) (pre-*Richardson*) (holding that director of crisis center, who was private individual, and who acted under color of state law by conducting strip search of female detainees for contraband at request of police officer, had qualified immunity from § 1983 suit arising out of searches because she acted as agent of officer who also had qualified immunity); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405–06 (7th Cir.1993) (pre-*Richardson*) (holding that private psychiatric facility that had been involved in emergency involuntary detention and treatment of arrestee pursuant to state court order was entitled to assert qualified immunity in light of policy considerations that underlie doctrine); *Rodriques v. Furtado*, 950 F.2d 805, 815 (1st Cir.1991) (pre-*Richardson*) (holding that private physician who conducted cavity search of drug suspect pursuant to facially valid search warrant was entitled to qualified immunity in suspect's § 1983 action, where he did not act on his own initiative or out of self-interest, he was uniquely

from scratch on this issue and turn to the two inquiries mandated by *Richardson*.

## I. History

Professional law enforcement's practice of enlisting private citizens to assist in making arrests has its origins in the English sheriff's common-law "power of the county" to summon a posse comitatus to suppress riots and civil disorders. *See, e.g., Coyles v. Hurtin,* 10 Johns. 85, 1813 WL 967 at *4 (N.Y.Sup.1813); *Hooker v. Smith,* 19 Vt. 151, ——, 1847 WL 2697 (1847); 1 William Blackstone, *Commentaries* *343.[33]* In the nineteenth century, most states of the Union codified by statute the sheriff's common-law power and provided criminal penalties for citizens who refused to provide such aid. *See, e.g., Watson v. State,* 83 Ala. 60, 3 So. 441, 441 (1888) (citing statute); *Robinson v. State,* 93 Ga. 77, 18 S.E. 1018, 1019 (1893) (same); *Firestone v. Rice,* 71 Mich. 377, 38 N.W. 885, 886 (1888) (same); *Elder v. Morrison,* 10 Wend. 128, ——, 1833 WL 3052 (N.Y.Sup.Ct.1833) (same); *Hooker,* 19 Vt. at ——, 1847 WL 2697 (same). Thus, by 1871, there was a firmly rooted tradition in this country of private citizens acting as adjuncts to professional law enforcement. The common law's treatment of private citizens who assisted in making unlawful arrests, however, is somewhat less clear.

Surveying the common law on this issue, an A.L.R. annotation states that:

> The view which may be said to represent the weight of authority is that where a private individual is requested or persuaded by a known peace officer to give assistance in the making of an arrest he is under no obligation, or at most the very slightest, to determine the lawfulness of the officer's conduct; since every citizen is bound to assist a known peace officer in making an arrest when called upon to do so, it would be inequitable to impose liability for conduct which the actor is under a legal obligation to perform; consequently, a private citizen so assisting an officer is not liable for false arrest or false imprisonment if it ultimately develops that the officer was acting unlawfully in making the arrest.

F.G. Madara, Annotation, *Liability, for False Imprisonment or Arrest, of a Private Person Answering Call of Known or Asserted Peace or Police Officer to Assist in Making Arrest which Turns Out to be Unlawful,* 29 A.L.R.2d 825, at § 2 (1953) (footnote omitted); *see also* 32 Am.Jur.2d *False Imprisonment* § 42 (1995) ("Private Persons Assisting Officer on Request") (similar); 35 C.J.S. *False Imprisonment* § 43, at 568 (1960) (similar). Several nine-

qualified to perform search procedure, and where court found that "[e]xtending qualified immunity to physicians under the circumstances of this case" would "benefit[ ] society by effectuating acceptable means to execute body cavity searches pursuant to a warrant issued on probable cause" and "benefit[ ] the party being searched by providing a safe means of conducting the search in a medically approved manner"); *Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 557 n. 21 (D.N.J.2000) (holding that private citizen asked by police to act as sign language interpreter in course of the interrogation of deaf suspect was entitled to qualified immunity on ground that she was a "private individual who was asked to participate in a single criminal investigation, an undoubtedly essential governmental activity, and also was acting under the supervision of the investigators who could not themselves perform the function"); *Ruppel v. Ramseyer,* 33 F.Supp.2d

720, 728–29 (C.D.Ill.1999) (holding that private physician and nurse were immune from suit for subjecting motorist to blood-alcohol test, after she refused treatment following automobile accident, since police officer, acting under authority vested by state statute, ordered them to withdraw blood after driver was arrested for driving under the influence).

**33.** Historically, this practice is explained by the English's traditional distrust of professional armies and police forces; the English instead relied on an armed citizenry to enforce the law and keep the peace. *See* Robert J. Cottrol, *Structure, Participation, Citizenship, and Right: Lessons from Akhil Amar's Second and Fourteenth Amendments,* 87 Geo. L.J. 2307, 2311 (1999) (reviewing Akhil Reed Amar, *The Bill of Rights* (1998)) (surveying history of the posse comitatus in England from the Assize of Arms in 1181 and the Magna Carta through the eighteenth century).

teenth-century decisions, some of which predate the enactment of § 1983, confirm the reasoning and result summarized in the ALR annotation. *See Watson*, 3 So. at 441–42; *Reed v. Rice*, 25 Ky. 44, ——, 1829 WL 1312, at *3 (1829); *Firestone*, 38 N.W. at 886–87; *Taylor v. Alexander*, 6 Ohio 144, 147–48 (1833); *Weatherford v. State*, 31 Tex.Crim. 530, 21 S.W. 251, 252 (1893); *Hooker v. Smith*, 19 Vt. at ——, 1847 WL 2697 ("It is said by a very accurate elementary writer, that, in the arrest of a party for crime, those who obey the sheriff's command will be thereby justified, though the sheriff himself might be acting without authority."); *McMahan v. Green*, 34 Vt. 69, ——, 1861 WL 3365 (1861). Later decisions also support this understanding of the common law. *See Mackie v. Ambassador Hotel & Invest. Corp.*, 123 Cal.App. 215, 11 P.2d 3, 6 (1932) (followed in *Peterson v. Robison*, 43 Cal.2d 690, 277 P.2d 19, 24 (1954)); *Edger v. Burke*, 96 Md. 715, 54 A. 986, 989 (1903); *Moyer v. Meier*, 205 Okla. 405, 238 P.2d 338, 340 (1951); *Presley v. Ft. Worth D.C. Ry. Co.*, 145 S.W. 669, 671–72 (Tex.Civ.App.1912, no writ); *cf. State v. Bertchey*, 77 N.J.L. 640, 73 A. 524, 526 (N.J.Err. & App.1909).

There was, however, a contrary line of common law authority,

> which support[s] the general theory that a citizen summoned by a known peace officer to aid in making an arrest has no greater immunity from liability for false arrest or false imprisonment than the officer has; everybody is presumed to know the law, and consequently a citizen so situated is presumed to know whether the officer is acting lawfully or unlawfully; accordingly it is the duty of such a citizen to determine the lawfulness or unlawfulness of the officer's proposed action, and if he decides wrongly that the officer is acting properly in making the arrest, he must be regarded as having made the decision at his peril, with the result that the person falsely arrest-

ed or imprisoned has a remedy against the assisting citizen.

Madara, *supra*, 29 A.L.R.2d 825, at § 2 (citing *Mitchell v. State*, 12 Ark. 50 (1851); *Pow v. Beckner*, 3 Ind. 475 (1852); *Vinton v. Weaver*, 41 Me. 430 (1856); *Elder v. Morrison*, 10 Wend. 128 (N.Y.Sup.Ct. 1833); *Martin v. Houck*, 141 N.C. 317, 54 S.E. 291 (1906); *Kirbie v. State*, 5 Tex. App. 60 (1878); *overruled on other grounds, Staples v. State*, 14 Tex.App. 136, 1883 WL 8880 (1883); *Staples*, 14 Tex.App. at ——, 1883 WL 8880, at *3–4); *see also Oystead v. Shed*, 12 Mass. 506, ——, 1815 WL 992, at *4–5 (1815) ("[W]here the original act of the officer is unlawful in itself, any stranger who aids him in it will be liable to the party injured, although he act by the officer's command. . . . [I]n the case at bar the illegality of his proceedings was not so obvious; and these two defendants may be supposed to have been ignorant of the law in this respect. But this, if true, would not excuse their conduct, nor diminish in any degree the injury which the plaintiff sustained.").

Finally, other decisions that approached the issue simply state that a person who is enlisted by an officer in making an arrest may claim the same justifications as the officer himself. *See Robinson*, 18 S.E. at 1019; *Goodwine v. Stephens*, 63 Ind. 112, ——, 1878 WL 6104, at *3–4 (1878); *Jennings v. Carter*, 2 Wend. 446, ——, 1829 WL 2300, at *4 (N.Y.Sup.1829).

Limiting one's attention to the decisions issued on or before 1912, as did the Court in *Richardson*,[34] it, thus, appears that courts in seven jurisdictions (viz., Alabama, Kentucky, Maryland, Michigan, Ohio, Texas, and Vermont) that expressly considered the issue held that persons who are enlisted by an officer to assist in making an arrest are justified in doing so even if the officer had no lawful authority to make the arrest at the time, while courts in an

---

**34.** *See Richardson*, 521 U.S. at 404–07, 117 S.Ct. at 2104–05. Interestingly, not only did the Court rely on decisions issued as late as

1912 in support of its analysis of what the common law provided in 1871, it cited no decision earlier than 1889. *See id.*

equal number of jurisdictions (viz., Arkansas, Connecticut, Indiana, Maine, New York, North Carolina, and Texas) held that such persons were not so justified. While the A.L.R. annotation may be correct in asserting that a preference for immunity was the majority view at the time it was written (1953), there simply was not a uniform common law rule on the subject at the time Congress enacted § 1983.

*Richardson* itself provides little guidance as to how equivocal the common law can be and still constitute a firmly rooted tradition, for in that case the Court found no firmly rooted tradition where there was no evidence of a common-law immunity at all. *See Richardson,* 521 U.S. at 404–07, 117 S.Ct. at 2104–05; *see also id.* at 415, 117 S.Ct. at 2109 (Scalia, J., dissenting) (stating that there was one pre–1871 decision in support of immunity). The *Richardson* majority adds, unhelpfully, that the single contrary case found by the dissent is not evidence of a firmly rooted tradition. *See id.* at 406, 117 S.Ct. at 2105. One must, therefore, look to common sense for a reasonable interpretation of the phrase "firmly rooted tradition." Obviously, the fact that one or even a few states followed a contrary rule cannot defeat a claim that a particular rule of immunity followed in all other states constituted a firmly root tradition in the common law at the time of § 1983's enactment, any more than can a single decision in support demonstrate that such a tradition did exist. But, here, the states were closely split on the question of whether the common law recognized such a defense. Under these circumstances, it is not clear whether immunity from tort liability for private persons called upon to assist in making an unlawful arrest can be deemed to have been a firmly rooted tradition in the common law at the relevant time.

## II. Purposes of the Qualified Immunity Doctrine

*Richardson*'s second, policy-oriented inquiry, however, clearly weighs in favor of recognizing such an immunity under § 1983. *Richardson* explained that the purposes of the qualified immunity doctrine are: (1) "to protect government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good," (2) "to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service," and (3) to protect "the public from unwarranted timidity on the part of public officials." *Richardson,* 521 U.S. at 408, 117 S.Ct. at 2105 (internal quotation marks and citations omitted). Each of these policy reasons is considered in turn below.

First, the necessity of protecting the government's ability to perform its traditional law enforcement function weighs heavily in favor of recognizing the availability of qualified immunity to private actors who are enlisted by law enforcement officials to assist in making arrests that prove to be unlawful. There can be little doubt that the threat of civil liability will "'distrac[t]'" private citizens "'from their ... dut[y],'" *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (quoting *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737), to promptly render aid to the police when it is needed and, thus, will hinder law enforcement, *see Reed,* 25 Ky. at ——, 1829 WL 1312, at *3 ("The right and power of an officer to summon the citizen to aid in the execution of precepts to him directed, is highly necessary, if not indispensable to the well being of society. If all those summoned had to examine and judge of the legality of the process, and then act upon their own responsibility, this necessary power in the officer would, in practice, be paralyzed in a great degree.").

Indeed, the necessity for prompt and largely unquestioning assistance by private persons, where such assistance is required by a police officer, is expressly cited as justification for according immunity to such persons in several of the leading common law decisions. For example, in *Wat-*

*son,* the Supreme Court of Alabama reasoned:

> The power of the officer to command assistance, when necessary, is essential to the due execution of the criminal law, and to the protection of society. This power, which extends to calling to his aid the posse comitatus, oftentimes would be unavailing, especially in emergencies requiring prompt action and assistance, if the person summoned was required to examine the papers of the officer, and determine his authority to make the particular arrest,—whether it would be safe to assist him. The officer is empowered by the statute to determine the necessity and time of assistance, and prompt obedience is the duty of the person summoned or commanded. The necessity does not admit of delay.

3 So. at 441. And, in *Firestone,* the Supreme Court of Michigan expressed similar sentiments:

> We do not think that a man called upon by the sheriff is required, at his peril, to ascertain whether the sheriff has a proper warrant, or whether the offense charged against the person to be arrested is a felony, or that he may refuse to act until he is satisfied that the sheriff is acting legally, or within the scope of his office, in a criminal case. If he were allowed to do this, the object of the law would be defeated, and the statute rendered nugatory in many cases. There is often no time for inquiry, as action must be immediate. The necessity of the case will not permit the person thus summoned to stop to examine papers, or take counsel as to the legality of the process in the officer's hands, or to inquire whether any process is necessary in the particular case where his aid is required.

38 N.W. at 886; *see also McMahan,* 34 Vt. at ——, 1861 WL 3365 ("The necessity of the case forbids that [a private citizen] should have the means of knowing or the time to inquire into the anterior proceedings. Nor does the law intend that any such inquiry should be tolerated, or that men called upon to aid officers in arresting criminals shall stop to examine papers and to take counsel as to the legality of the process under which the officers act.").

There are, of course, limiting principles that apply to this justification, *see infra* Discussion (3)(A)(2)(a)(ii), but the necessity for prompt assistance by private actors is especially strong in circumstances such as those presented by this case. Drug traffickers often make use of air courier services to smuggle drugs into this country. Without the assistance of the courier services, it would not be possible to make effective controlled pick-ups or deliveries of courier shipments containing contraband, and criminals using such services, who could otherwise be readily apprehended, would succeed in the importation of illegal drugs into this country. *See generally Illinois v. Andreas,* 463 U.S. 765, 769–70, 103 S.Ct. 3319, 3323–24, 77 L.Ed.2d 1003 (1983) (noting usefulness of controlled delivery as technique in apprehending drug traffickers). Moreover, it is essential that the courier service's cooperation be prompt, for a delay in the delivery of an expected shipment of drugs may signal to the sophisticated trafficker that the package has been intercepted and that law enforcement officials have become aware of its contents. Thus, time will generally not permit the local management of a courier service to consult the company's general counsel in deciding whether and how to cooperate with law enforcement in making a controlled pick-up or delivery. In a very real sense, then, in such circumstances, assistance delayed is assistance denied.

The second policy consideration cited in *Richardson*—ensuring that talented candidates are not deterred by the threat of damages suits from entering public service—also weighs in favor of extending qualified immunity to private actors who are enlisted by law enforcement to assist in making arrests. The appropriate analog for this consideration in the present

case is ensuring that the private actors best situated to assist law enforcement are not discouraged from rendering their aid by the threat of civil liability. In the circumstances of this case, this means encouraging the cooperation of the particular courier service that the drug trafficker expects to deliver the shipment of contraband; obviously, it would do the police or Customs agents no good to have a different, unexpected courier attempt to effect the pickup or delivery. In other cases, such as that of an officer on the street who requires assistance in subduing a suspect who resists arrest, it will mean encouraging the nearest, able-bodied by-stander to come to the officer's aid. The threat of liability without the hope of immunity would, no doubt, often have the untoward result that the private actor best situated to assist the police will simply choose not to become involved. Moreover, for this class of private actors, the fear of liability is not countervailed by the profit motive and insurance coverage of the *Richardson* defendants. *Cf.* 521 U.S. at 411, 117 S.Ct. at 2107.

Finally, the third purpose behind the qualified immunity doctrine—preventing unwarranted timidity in the performance of public duties, which the Supreme Court identified as the "most important," *Richardson*, 521 U.S. at 409, 117 S.Ct. at 2106, decidedly weighs in favor of according qualified immunity to private actors enlisted by law enforcement to make arrests. In *Richardson*, the Court found that this policy concern does not warrant extending qualified immunity to privately-employed prison guards because it "is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id.* Because these market pressures "encourage vigorous performance" of the guards' duties, there is no need to afford them qualified immunity to encourage such performance. *Id.* at 411, 117 S.Ct. at 2107.

In reaching this result, the Court specifically cited the following features of the private firm for which the guards worked: (1) the guards worked for a private firm "systematically organized to perform a major administrative task for profit"; (2) the firm "performs that task independently, with relatively less ongoing direct state supervision [than publicly operated prisons]"; (3) by statute, the firm "must buy insurance sufficient to compensate victims of civil rights torts"; (4) "since the firm's first contract expires after three years, its performance is disciplined, not only by state review, but also by pressure from potentially competing firms who can try to take its place"; and (5) "the contract's provisions—including those that might permit employee indemnification and avoid many civil service restrictions—grant this private firm freedom to respond to [this threat of replacement] through rewards and penalties that operate directly upon the employees." *Id.* at 409–10, 117 S.Ct. at 2106–07 (citations omitted).

None of these features characterize the class of private actors exemplified by Airborne. First, Airborne, like the private defendants in the common law cases that support granting immunity, was not compensated for its assistance in making the arrest and, thus, had no profit motive to assist law enforcement.[35] Second, Airborne's involvement in the law enforcement was, again like that of those private defendants, brief and isolated, and its actions were directed entirely by the law enforcement defendants. This distinction between Airborne and the *Richardson* defendants is particularly significant in light of the fact that the *Richardson* court closed with the "caveat" that its decision to deny qualified immunity was "narrowly" tailored to the circumstances of that case and intimated that the same result might not obtain in a case, like this one, that "involve[s] a private individual briefly associated with a government body, serving as

---

**35.** This consideration would not necessarily point in the same direction in a case involving

a paid police informant, but that case is not before the court.

an adjunct to government in an essential governmental activity, or acting under close official supervision." 521 U.S. at 413, 117 S.Ct. at 2108. Third, there is no evidence before the court that Airborne carries insurance for civil rights torts against non-employees. While Airborne presumably has commercial general liability and employer liability insurance, those types of policies may not cover intentional torts against non-employees. Moreover, private individuals in Airborne's position will virtually never carry such insurance. Fourth, Airborne did not act pursuant to a renewable contract with the NYPD or Customs. Rather, it was uniquely called upon for assistance by law enforcement for the simple reason that the package to be delivered was an Airborne package. Airborne and other such private actors enlisted by the police on particular, isolated occasions are, therefore, not disciplined by a desire to be repeat players in the business of assisting the police in making arrests. Finally, there is no evidence before the court that Airborne's contracts with its employees create a mechanism whereby it can effectively police its own actions when assisting law enforcement, and, again, Airborne has no incentive to create such a self-policing mechanism in order to increase its chances of being asked to assist law enforcement in making future arrests. Still less does this fifth factor have any application to the (probably more typical) case of a private individual who answers the call of the police to assist in making an arrest. Thus, for private defendants in Airborne's position, the threat of § 1983 liability without the promise of qualified immunity is not countervailed by any of the factors that discouraged unwarranted timidity in the performance of the *Richardson* defendants' duties.

In sum, then, there was (1) strong support in the common law as of 1871 for shielding private citizens who are enlisted by the police to assist in making unlawful arrests, though that support probably does not rise to the level of a firmly rooted tradition, and (2) the purposes behind qualified immunity all strongly weigh in favor of recognizing the availability of qualified immunity in such cases.

The conflict between the two prongs of the *Richardson* test in this case, thus, raises the question whether the *Richardson* test is truly conjunctive in nature. On the one hand, *Richardson* could be interpreted as commanding a reviewing court to examine both history and policy in deciding whether qualified immunity is available, but allowing the court to weigh the two considerations against each other if the two inquiries yield opposite results. On the other hand, *Richardson* may require that both inquiries be made and that each of them weigh in favor of recognizing the availability of qualified immunity.

■■■■ The Supreme Court's decision in *Wyatt* partially answers this question. There, the justices made clear that "irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions." *Wyatt*, 504 U.S. at 164, 112 S.Ct. at 1831 (citing *Tower v. Glover*, 467 U.S. 914, 920, 104 S.Ct. 2820, 2824, 81 L.Ed.2d 758 (1984); *Imbler v. Pachtman*, 424 U.S. 409, 424–429, 96 S.Ct. 984, 992–994, 47 L.Ed.2d 128 (1976)). Thus, it is clear that the strength of common law tradition alone cannot justify extending qualified immunity to a given class of § 1983 defendants. However, this result leaves open the question presented by this case: whether sufficiently strong policy considerations, buttressed by a clear line of common law authority, though not one that can be properly described as a firmly rooted tradition, suffice to establish qualified immunity for a particular class of private actors.

The Supreme Court's statements on the issue of necessity of common-law support, although at times conflicting, appear to provide an affirmative answer. In *Tower*, the Court declined to extend immunity to public defenders on the basis of policy considerations alone, stating that "[w]e do

not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." 467 U.S. at 922–23, 104 S.Ct. at 2826. However, in *Anderson*, the plaintiffs argued that no immunity should be provided to police officers who conduct warrantless searches of innocent third parties' homes in search of fugitives if the fugitive was, in fact, not present, since the English common law provided for strict liability in such circumstances. The Court rejected this argument, explaining:

> Although it is true that we have observed that our determinations as to the scope of official immunity are made in the light of the "common-law tradition," we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law. That notion is plainly contradicted by *Harlow*, where the Court completely reformulated qualified immunity along principles not at all embodied in the common law . . .

483 U.S. at 644–45, 107 S.Ct. at 3041–42 (citations omitted) (footnote omitted); *see also Wyatt*, 504 U.S. at 166, 112 S.Ct. at 1832 (affirming this characterization of *Harlow*). The distinction between *Tower* and *Anderson* perhaps lies in the fact that in *Tower*, the Court found no common-law support for the immunity in question, while in *Anderson*, it did, albeit not for the precise factual scenario there in question. *Compare Tower*, 467 U.S. at 922, 104 S.Ct. at 2825 (finding that common law did not shield defense lawyers from tort liability for intentional misconduct), *with Anderson*, 483 U.S. at 645, 107 S.Ct. at 3042 (holding that common law would shield officers from liability if fugitive was present in third-party's home). Thus, in cases such as this, where there is strong, though not univocal, common law support for extending qualified immunity, policy considerations may play a dispositive role.

In this regard, it is significant that in both of its private actor-qualified immunity

decisions, the Court conducted an extended examination of the policy considerations that weighed for and against recognizing qualified immunity in favor of the defendants therein, even after it found no common-law support for extending immunity. *See Richardson*, 521 U.S. at 408–12, 117 S.Ct. at 2106–07; *Wyatt*, 504 U.S. at 167–68, 112 S.Ct. at 1833–34. It may be inferred, then, that the *Richardson* and *Wyatt* courts contemplated that qualified immunity might be available in cases where policy considerations strongly support extending qualified immunity, even if the relevant common law authorities do not univocally support its recognition.

This case presents exactly such a scenario, and the above discussion of the relevant policy considerations leads to the conclusion that qualified immunity is available to private actors who are enlisted by law enforcement officials to assist in making an arrest.

This holding, however, marks only the beginning of the inquiry as to whether Airborne is entitled to qualified immunity in this case. Two more questions must first be answered to make that determination: (1) Under what circumstances is a private defendant in a given case entitled to the qualified immunity so recognized?, and (2) Have those circumstances been shown in this particular case?

**ii. Requirements for Entitlement to Qualified Immunity for Private Defendants in Airborne's Position**

In *Harlow*, the Supreme Court announced the general standard for granting qualified immunity in cases involving public officials: qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The *Harlow* standard is one of "objective reasonableness," not, as earlier precedent had held, subjective good faith or malice. *Id.* at 815–19, 102 S.Ct. at 2736–39. As previously discussed,

in the context of a § 1983 false arrest suit against a police officer, the *Harlow* standard implies that the arresting officer is entitled to qualified immunity if and only if it was objectively reasonable for him to believe that probable cause for the arrest existed. *See Malley,* 475 U.S. at 343–45, 106 S.Ct. at 1097–98. The determination of whether an officer's belief that probable caused existed was objectively reasonable will often require an examination of the information possessed by the officer and clearly established law at the time of arrest. *Cf. Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040 (applying standard in illegal search case).

 In adapting this standard to private actors enlisted by law enforcement to assist in making an arrest, it is appropriate again to look to history and policy to determine the contours of the qualified immunity available in such cases. Certainly, at a minimum, the private defendant seeking qualified immunity should have determined whether the request for assistance came from someone who was in fact a law enforcement officer before acting, since the requestor's status as a known law enforcement official will be an important and easily recognized indicia of probable cause for a reasonable private actor in the defendant's position. Therefore, a private defendant who acts without first making even this minimal determination is rightly held to act at his peril. This threshold requirement is consistent with the common law underpinnings of the qualified immunity here recognized, for even those common law courts that otherwise acknowledged cooperation with law enforcement as a defense to liability for false arrest held that the defense would be lost if the private defendant did not act at the request of a known law enforcement official. *See Madara, supra,* 29 A.L.R.2d 825, at § 3 (citing *Cincinnati, N.O. & T.P.R. Co. v. Cundiff,* 166 Ky. 594, 179 S.W. 615 (1915)); *see also Watson,* 3 So. at 441 (relying on fact that private defendant had responded to call of a known officer); *McMahan,* 34 Vt. at ——, 1861 WL 3365 (same).

 However, the mere fact the request for assistance in making an arrest came from a known law enforcement official generally will not be sufficient to grant qualified immunity, for the law enforcement official himself may be proceeding without an objectively reasonable belief that probable cause exists. Granting qualified immunity in such instances would thwart § 1983's purpose of preventing the abuse of official authority. Indeed, one of the primary concerns of those common law courts that refused to recognize cooperation with law enforcement as a defense in false arrest actions was that private defendants should not be shielded from liability for their assistance in patent abuses of police authority. *See, e.g., Oystead v. Shed,* 12 Mass. ——, 1815 WL 992, at \*5 ("Suppose the officer in this case had proceeded, without necessity or provocation, to beat and wound the plaintiff or his family, it is very clear that these two defendants would not be justified in aiding him in such wanton abuse."). *But see Watson,* 3 So. at 441 ("When [the officer's] general power is known, his call will justify the citizen in yielding obedience, *unless [the private citizen] has notice of the want of authority in the particular case in which assistance is required.*" (emphasis added)); Restatement (Second) of Torts § 139 cmt. d (1965) (stating that "the [private] actor is privileged to rely upon the officer's request and assist him unless the facts are such that the actor knows or is convinced beyond a reasonable doubt that the officer's suspicion is unreasonable").

Nevertheless, it would not be appropriate to apply the same standards to a private defendant as would be applied to an actual law enforcement official when gauging the objective reasonableness of the former's belief that probable cause existed. Probable cause, strictly construed, is a concept that often confounds even professional law enforcement officials, who have received (one hopes) at least rudi-

mentary training on the applicable rules of law. The typical private citizen has had no such training and, therefore, cannot fairly be held to the same standard as professionals in the field. Moreover, the policy concerns voiced by several of the common law courts recognizing such an immunity—viz., that the necessity of prompt action makes it inappropriate to require the private citizen to cross-examine the police officer who calls for his aid regarding his authority to make the arrest and the lawfulness thereof—further argue in favor of such a result. *See Watson,* 3 So. at 441; *Firestone,* 38 N.W. at 886; *McMahan,* 34 Vt. at ——, 1861 WL 3365. On the other hand, at some point, even private citizens untrained in the niceties of probable cause must be presumed to know that a particular arrest is without justification or that a course of action in effecting an arrest is patently abusive. A proper balancing of § 1983's protective purpose and the strong policy considerations in favor of recognizing qualified immunity, thus, suggests that the appropriate standard for gauging the objective reasonableness of a private defendant's belief is that of the reasonable private citizen in the defendant's position, rather than that of the reasonable law enforcement official. *Cf., e.g., Rodriques,* 950 F.2d at 816 (holding physician in action based on illegal cavity search to standard of "a reasonable physician").

The facts necessary to establish the objective reasonableness of a private actor's belief under this standard will necessarily turn on the circumstances of the case. *Cf. Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040. For example, in the case of a bystander who comes to the aid of a uniformed police officer who is chasing a fleeing suspect, the bystander's recognition of the officer as such and the officer's call for help may be all that is required. But an officer's subsequent beating of an arrestee who no longer poses a danger would not privilege the private citizen to assist in the beating. And in other circumstances, where, as here, the private actor possesses considerably more information and has the opportunity for a greater degree of reflection, it is not unreasonable to expect more careful consideration on the part of the private citizen of the appropriateness of the assistance that he is furnishing. In all cases, however, the private citizen's belief is unreasonable when the assistance he furnishes to a law enforcement official is a patently abusive misuse of police authority.

Finally, an assisting private person who materially deviates from the directions given to him by law enforcement cannot reasonably expect that his unsupervised actions will be shielded from liability. This principle is, again, consistent with the common law basis for recognizing qualified immunity. *See Firestone,* 38 N.W. at 886–87 (holding that private person requested to assist known police officer in making arrest is not liable "if, in his acts, he confines himself to the order and direction of the sheriff"); *Edger,* 54 A. at 989 (holding private defendant would not be liable "if he . . . kept within [the deputy sheriff's] orders and directions."). Nor should the law encourage such deviations by the promise of qualified immunity, for the risk of a constitutional violation is greatly enhanced when the assisting private person takes action without the authorization of a trained law enforcement professional. In such circumstances, the private defendant, again, may be properly held to act at his peril.

On the basis of these competing considerations and the standards for qualified immunity announced in *Harlow, Malley,* and *Anderson,* it follows that in order to be entitled to qualified immunity from liability under § 1983 for false arrest, a private person enlisted by a law enforcement official to assist in making an arrest must show that: (1) he acted at the request of one whom he knew to be, and who in fact was, a law enforcement official; (2) the assistance requested by the law enforcement official and provided by the private citizen was not patently abusive; and (3) his actions did not materially deviate from

those that the law enforcement official directed him to take.

### iii. Application of the Qualified Immunity Standard to Airborne

█ In this case, there is no dispute that Airborne responded to a request for assistance from known law enforcement officials, and none of the parties has alleged that Airborne's employees took any action that they were not directed to take by those officials. The dispositive question in deciding whether to grant Airborne qualified immunity is, therefore, whether, in light of the information Airborne possessed at the time, a reasonable private citizen in its position would have believed the conduct it undertook in assisting in the Mejias' arrest was not patently abusive.

Although the grounds required to establish an objectively reasonable belief that a practice is not patently abusive are necessarily slimmer than those required to establish probable cause, the considerations discussed above, *supra* Discussion (3)(A)(1)(a), are sufficiently strong to undermine any objectively reasonable belief that Airborne could have had that conduct in question here did not fall into the patently-abusive category.

Again, viewing the evidence in the light most favorable to plaintiffs, the jury could find that there was never an initial call to Airborne from "Luis," and that Airborne knew that the "Luis" it spoke to on November 29th and 30th claimed the package solely on the strength of misrepresentations that it was a toy or game of some sort from Venezuela. A reasonable layperson would have to recognize that it was a patently abusive tactic on the part of the police to induce someone to pick up a package through a representation that it was from Venezuela and then to arrest

that person on the pretense that they were the intended recipients of a package of contraband from Columbia. No reasonable layperson could view what was done here as anything other than a set-up or believe that Mr. Mejia thought he was coming to pick up drugs. This is not a case where a layperson is forced to make subtle legal distinctions about the precise boundaries of probable cause but rather is an instance where ordinary common sense dictates only one conclusion: viz., that the practice in question, assuming Airborne participated in it knowingly, which we must for these purposes, was patently abusive.

Therefore, plaintiffs' version of the facts would warrant the conclusion that Airborne possessed information that made it objectively unreasonable for a private actor in its position to believe that the Mejias' arrest was not patently abusive, and Airborne is consequently not entitled to qualified immunity on the Mejias' § 1983 false arrest claims. *See Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir.2000) (holding that where defendant claiming qualified immunity relies on facts that are in dispute, qualified immunity cannot be granted).[36]

### b. Qualified immunity from liability for malicious prosecution is not available to private actors in Airborne's position or to the other defendants in the circumstance of this case.

█ Airborne, as well as the other defendants, appears to assume that in this case qualified immunity is equally available (if it is available at all) with respect to both the false arrest claims and the malicious prosecution claims, and that the same

---

**36.** However, because the present denial of qualified immunity is based on the existence of a genuine issue of material fact, Airborne is not necessarily precluded by this finding from defending itself at trial on the ground that its actions were, in fact, objectively reasonable. *Cf. Richardson,* 521 U.S. at 413–14, 117 S.Ct. at 2108 (declining to reach question of whether affirmative defense based on good faith and/or probable cause is available to private defendants not otherwise entitled to qualified immunity); *Wyatt,* 504 U.S. at 169, 112 S.Ct. at 1834 (same).

standards for entitlement apply. The assumption is mistaken. Plaintiffs' false arrest claims turn on what defendants allegedly did *before* the arrest, whereas their malicious prosecution claims depend crucially on what defendants allegedly did *after* the arrest. Consequently, different historical and policy considerations come to bear on the determination of whether qualified immunity is available with respect to plaintiffs' malicious prosecution claims.

To begin, it must be noted what plaintiffs' malicious prosecution claim is not. Plaintiffs' claim is not that Airborne or the other defendants simply went to prosecutors and related the facts as they honestly believed them to be and then let the prosecutor make his or her determination whether to commence proceedings.[37]

Instead, the gist of plaintiffs' malicious prosecution claims is that, after having deceived the plaintiffs into claiming the package, defendants thereafter misrepresented to, and concealed from, prosecutors the true circumstances leading to the arrest, and, thus, induced the prosecutor to commence proceedings based on manufactured evidence. Defendants further induced the prosecutor to continue the proceedings by giving testimony before the grand jury that was false and/or contained material omissions. Qualified immunity is not available to either Airborne, or the law enforcement defendants, in such circumstances.

■■■■ While the law does recognize an immunity—indeed, an absolute immunity—for some individuals who give false information to the prosecutor and who testify falsely before a grand jury, the availability of immunity turns on whether the individual was a complaining witness. *See White v. Frank,* 855 F.2d 956, 959–61 (2d Cir.1988). Complaining witnesses—be

they private citizens or police officers—who testify falsely before a grand jury, or other non-adversarial pre-trial proceedings, are not entitled to absolute immunity. *See Malley,* 475 U.S. at 340, 106 S.Ct. at 1096 (warrant application); *White,* 855 F.2d at 959 (grand jury); *id.* at 962 n. 6 (noting that immunity analysis for false testimony by complaining witness does not turn on whether defendant is police officer or private citizen (citing *Briscoe v. LaHue,* 460 U.S. 325, 335–36, 103 S.Ct. 1108, 1116, 75 L.Ed.2d 96 (1983))). Whether a witness is a complaining witness is a fact-based question that coincides with the determination of whether the witness played such a role in initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution. *See id.* at 959, 962.

■■■■ A witness, such as Detective Skinner, who files a charging affidavit is clearly a complaining witness, but other witnesses may be considered complaining witness as well if the information they falsely gave the prosecutor induced the prosecutor to act. *See Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997). In addition, persons who conspire with a complaining witness to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings and the jury's verdict are jointly liable for malicious prosecution. *See id.* at 131. Because there is sufficient evidence for a reasonable juror to find that Airborne knowingly participated in the manufacture of evidence on which the prosecutor relied—viz., defendants' account that the Mejias readily and willingly claimed the package without any pretense having been made as to its origin, Airborne, whose employees Bezmen and Gennarelli met with the prosecutor and testified be-

---

**37.** In such cases, qualified immunity is, no doubt, available, although it is not clear that there would be any need for a defendant to invoke qualified immunity in such circumstances since the prosecutor's intervening act

of judgment would break the chain of causation between such a defendant's acts and the plaintiff's injury, *see Taylor v. Gregg,* 36 F.3d 453, 456–57 (5th Cir.1994); *Hand v. Gary,* 838 F.2d 1420, 1428 (5th Cir.1988).

fore the grand jury, must be considered a complaining witness, or, at the very least, an actor that conspired with a complaining witness.

The question here, then, is whether a complaining witness who knowingly provides false information on which a prosecutor relies, or a defendant who conspires with one who does, is, nonetheless, entitled to at least qualified immunity. In view of the general purpose of the qualified immunity doctrine, the question almost answers itself. As the Supreme Court noted in *Malley*, qualified immunity does not protect those who "knowingly violate the law," *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096, and "[t]he right to be free from ... prosecution in the absence of probable cause is a long established constitutional right," *Ricciuti*, 124 F.3d at 128. Therefore, one who gives false information to a prosecutor that he knows will induce a prosecutor to commence or continue proceedings against a plaintiff, knowingly violates the law and is not entitled to qualified immunity for his actions. *Cf. id.* at 131 (action against police officers who "create[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors"). Moreover, extension of qualified immunity in such circumstances would thwart the basic purpose of § 1983 itself—

to protect persons from abuse of official authority, *see Wyatt*, 504 U.S. at 161, 112 S.Ct. at 1830, and, thus, must be rejected in any event. *See id.* at 164, 112 S.Ct. at 1831 (holding that "irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions").[38]

An examination of the specific inquiries mandated by *Richardson* confirm this result. *See* 521 U.S. at 404, 117 S.Ct. at 2104(holding that court must "look both to history and to the purposes that underlie government employee immunity" to determine whether qualified immunity is available in given context). With respect to common law tradition, in *White* the Second Circuit conducted an extensive examination of whether the common law provided a defense or immunity from malicious prosecution to complaining witness before the grand jury or other individuals who induce a prosecutor to act. *See* 855 F.2d at 959–61. The Second Circuit found that the common law did not provide a defense or immunity to such individuals, regardless of whether they were private persons or police officers. *See id.* at 959–61, 962 n. 6. Thus, as in *Tower*, the proposed extension of qualified immunity to defendants who manufacture evidence may be rejected as

---

**38.** Although the decision is not precisely on point, in the context of a § 1983 fabricated confession claim, the Second Circuit rejected the argument that qualified immunity was available based on the objective reasonableness of police officers' belief that probable cause existed, notwithstanding the officers' alleged fabrication of a false confession:

> This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a

suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process."

*Ricciuti*, 124 F.3d at 130 (citations omitted). Similarly, in the context of a § 1983 malicious prosecution claim, defendants should not be able to claim qualified immunity on the basis of an objectively reasonable belief that probable cause existed, where there is evidence on which a reasonable juror could find that the defendants induced the prosecutor to commence proceedings through the presentation of false testimony.

completely lacking in any common law basis. *See* 467 U.S. at 920–22, 104 S.Ct. at 2825.

As an independent ground for rejecting the proposed extension of qualified immunity, none of the specific policy concerns cited by *Richardson*—preserving the government's ability to perform its traditional functions (here, prosecuting wrongdoers); encouraging qualified candidates to enter public service; and discouraging unwarranted timidity on the part of public officials in the performance of their duties by removing the threat of liability for reasonable errors of judgment—support extending qualified immunity in the circumstances alleged in this case. *See* 521 U.S. at 407–08, 117 S.Ct. at 2105–06.

First, imposing liability for malicious prosecution without the promise of qualified immunity for individuals—be they private actors or law enforcement officers—who induce prosecutors to commence proceedings against someone against whom they have manufactured evidence will not hamper the government's ability to prosecute wrongdoers, since by hypothesis the accused has been framed. Moreover, with respect to private actors who would seek qualified immunity in such circumstances, the necessity for rendering prompt and largely unquestioning assistance to law enforcement when asked to do so and the statutory duty to provide such assistance—considerations that figured so prominently in the preceding discussion of whether qualified immunity is available to private actors who answer law enforcement's call for assistance—plays no role at the prosecutorial stage of law enforcement. By that time, a private actor who has been asked to participate in the manufacture of evidence has had an opportunity to reflect on whether probable cause or objectively reasonable grounds for probable cause existed, and the private actor cannot invoke any duty, statutory or otherwise, that would justify continuing to assist law enforcement officers who, with its help, have manufactured evidence against the accused.

Second, denying qualified immunity to those who would manufacture evidence against an accused and induce a prosecutor to act on it will not discourage qualified candidates from entering public service, since by definition such individuals are not fit for public service.

Third, timidity in engaging in the manufacture of evidence and submission of that evidence to the prosecutor is fully warranted. In sum, none of purposes of the qualified immunity doctrine cited by *Richardson* are served in such circumstances.

The evidence the plaintiffs have produced permits a reasonable juror to conclude that Airborne and the other defendants knowingly manufactured evidence without any indication of valid law enforcement considerations to necessitate or excuse such actions. Viewing the evidence in the light most favorable to plaintiffs, (1) it is questionable whether Airborne ever received a call from "Luis"; (2) Airborne, it must be assumed, knew of the alteration of the package to show a delivery from Venezuela, not Columbia, its true point of origin, and has offered no explanation for this deception;(3) the Mejias did not rip open any of the portfolios in the package; and (4) Mrs. Mejia voluntarily alerted the police defendants to the presence of what must be assumed were similar but unopened portfolios in her and her husband's office. Therefore, plaintiffs have demonstrated that there is a genuine issue of material fact as to whether Airborne and the other defendants knowingly participated in the manufacture of evidence against them and then induced the prosecutor to act on that evidence, and if a jury finds these to be the facts, qualified immunity from malicious prosecution would not be available to either Airborne or the other defendants in this case.[39]

**39.** *See* n. 36, *supra.*

### 3. Summary

Plaintiffs have demonstrated that genuine issues of material fact exist (1) as to whether Airborne had probable cause either at the time of their arrest or at the time criminal proceedings were commenced, (2) as to whether it was objectively reasonable for Airborne to believe their conduct with respect to the Mejias' arrest was not patently abusive, and (3) that preclude even the availability of qualified immunity on their malicious prosecution claims to private actors in Airborne's position. Accordingly, Airborne's motion for summary judgment on plaintiffs' § 1983 false arrest and malicious prosecution claims is denied.

### 4. Respondeat Superior

Throughout the foregoing discussion, it was assumed that Airborne can be held liable under § 1983 for the actions of its employees in this case. Although Airborne did not raise the issue in its briefs, this assumption does not appear to be correct. As previously discussed, under *Monell,* a municipality cannot be held vicariously liable under § 1983 for the actions of its employees. *See* 436 U.S. at 694, 98 S.Ct. at 2037. Instead, a municipality can only be held liable if the constitutional violation of which a plaintiff complains resulted from an official custom, policy, practice, or usage of the municipality. *See id.* at 690–91, 98 S.Ct. at 2035–36. The Second Circuit, along with every other court of appeals that has considered the issue, has held that *Monell* applies with equal force to private corporations sued under § 1983. *See Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408–09 (2d Cir.1990); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982); *Iskander v. Village of Forest Park,* 690 F.2d 126, 128–29 (7th Cir.1982); *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 975–76 (8th Cir.1993); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989); *Harvey v. Harvey,* 949 F.2d 1127, 1129–30 (11th Cir.1992); *see also Draeger v. Grand Cent., Inc.,* 504 F.2d 142, 145–46 (10th Cir.1974) (predating *Monell,* but holding that private employers are not liable under § 1983 for constitutional torts of their employees); *Smith v. Brookshire Bros.,* 519 F.2d 93, 94 (1975) (per curiam) (same).

▮▮▮ Here, there is no evidence that Airborne had a corporate custom, policy, practice or usage of assisting law enforcement in making the type of improper controlled pickup alleged by plaintiffs. Moreover, although a private corporation, like a municipality, can be held liable under *Monell* for a single act of an employee with final policymaking authority in the particular area involved, *see Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 728–29 (4th Cir. 1999) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality opinion)), the two Airborne employees involved in the Mejias' arrest and prosecution do not appear to have been final corporate policymakers in the area of cooperation with law enforcement.[40] Bezmen was Airborne's

---

40. Two other Airborne employees were involved in the investigation, but none of their actions in .the case could be construed as a constitutional violation of any sort. On November 19, 1993, at Bezmen's request, Dennis Boyle ("Boyle"), Airborne's district customer service manager for the mid-Atlantic region, contacted Airborne employees in Miami and Boston and directed them to create computer entries indicating that the package had been misrouted from Miami to Boston and then rerouted from Boston to New York. (Pl.'s Ex. K, at 572–75 (Boyle's testimony at Mr. Mejia's criminal trial)). Boyle did so in order to create an explanation for the delay in the delivery of the package in the event that the intended recipient called to inquire about its whereabouts and, thus, to deflect any suspicion that it might have been intercepted by law enforcement. (*Id.;* Summers Dep. at 42, 44–45.) These actions were entirely proper, and plaintiffs have not alleged, nor is there any evidence, that Boyle was involved in, or knew about, the subsequent creation of the Caracas airbill or the four alleged telephone calls to Mr. Mejia.

In addition, Bill Savino, Gennarelli's immediate supervisor and the district manager of Airborne's Inwood station, played an even more minimal and constitutionally innocu-

regional security manager for the greater New York area only,[41] while Gennarelli was the "cartage supervisor" for the particular Airborne office through which the controlled pickup was conducted.[42] Other courts have held that corporate employees in similar positions are not final policymakers for § 1983 purposes. *See, e.g., Austin v. Paramount Parks*, 195 F.3d 715, 729–30 (4th Cir.1999) (holding that theme park's manager of loss prevention was not a final policymaker); *Smith v. United States*, 896 F.Supp. 1183, 1186 (M.D.Fla.1995) (holding that facility manager of particular halfway house run by private corporation was not final policymaker); *Miller v. Correctional Med. Sys., Inc.*, 802 F.Supp. 1126, 1132 (D.Del.1992) (holding that state medical director of prison medical services corporation was not final policymaker). *See generally Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir.2000) (discussing standard for determining whether employee is final policymaker and noting that authority to exercise discretion in performance of duties is not, by itself, sufficient). Notably, a plaintiff has the burden of proof on the issue of whether an employee is a final policymaker, and "it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes*, 208 F.3d at 57–58. Airborne would, therefore, not appear to have any liability under § 1983 for Bezmen or Gennarelli's actions.[43]

ous role that consisted simply of putting S/A Tipton in touch with Gennarelli. (Gennarelli Dep. at 12–13, 21–23.)

**41.** Bezmen stated in deposition that his duties as regional security manager consisted primarily of investigating claims related to lost or stolen property or internal problems with employees. (Bezmen Dep. at 6–7.) Bezmen, whose jurisdiction consisted of New York, Connecticut, and Long Island, reported to Don McGorty, who, in turn, was Airborne's director of security for the eastern United States. (*Id.* at 7, 19–20.)

**42.** Gennarelli stated in deposition that his duties as a cartage supervisor consisted of supervising a group of 30 drivers at Airborne's Inwood station. (Gennarelli Dep. at 12.)

**43.** Two district court decisions have held that the mere fact that a private corporation's employee has conspired with a state official is enough to create § 1983 liability for the corporation. *See Rojas v. Alexander's Dept. Store, Inc.*, 654 F.Supp. 856, 859 (E.D.N.Y.1986), *subsequent jury verdict upheld on other grounds*, 924 F.2d 406 (2d Cir.1990); *Classon v. Shopko Stores, Inc.*, 435 F.Supp. 1186, 1187–88 (E.D.Wis.1977). Neither is a viable statement of the law.

In *Classon* and *Rojas*, the district courts based their conclusion on the Supreme Court's decision in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See Rojas*, 654 F.Supp. at 859; *Classon*, 435 F.Supp. at 1187–88. In *Adickes*, the Court held that a department store could—potentially—be held liable under § 1983 where one of its employees, acting jointly with a police officer, refused service to a white woman in the company of black persons. *Adickes*, however, only held that § 1983 liability can be predicated, *in part*, on a conspiracy between a private defendant and state officials, *see id.* at 152, 90 S.Ct. at 1605–06, and that the plaintiff had shown a genuine issue of material fact as to whether the employee had conspired with the police officer, *see id.* at 153–61, 90 S.Ct. at 1606–10. Contrary to the *Classon* and *Rojas* district courts' characterization of the *Adickes* decision, the Supreme Court did not actually hold the store liable, for it expressly remanded the case for consideration of whether the plaintiff could show that "[the store]'s refusal to serve her was motivated by [a] state-enforced custom," *id.* at 174, 90 S.Ct. at 1617, of "segregating the races in public eating places," *id.* at 173, 90 S.Ct. at 1616; *see also id.* at 169–71, 90 S.Ct. at 1614–15 (same). As discussed above, the Supreme Court's later decision in *Monell*, and subsequent decisions by the Second Circuit and other circuit courts confirm that a private corporation cannot be held liable in the absence of the showing of an official policy, practice, usage, or custom. In this case, there is no evidence that Airborne's employees acted pursuant to an official corporate policy or in compliance with an official municipal policy, *see supra* Discussion (1)(A), with regard to controlled deliveries or the commencement or continuation of criminal proceedings.

Moreover, the *Classon* district court's holding that a corporation can be held liable in the absence of a showing of official policy was implicitly overruled by the Seventh Circuit in *Iskander*. *See Iskander*, 690 F.2d at 128–29 (refusing to hold store liable absent showing of corporate policy, where store's detective, acting in concert with local police,

Ordinarily, a district court should not raise sua sponte a nonjurisdictional defense not raised by the parties, unless the defense implicates values that transcend the concerns of the parties to an action. *See Acosta v. Artuz,* 221 F.3d 117, 122 (2d Cir.2000).[44] However, "the question of whether a given official is the [corporation]'s final policymaking official in a given area is a matter of law *to be decided by the court.*" *Jeffes,* 208 F.3d at 57 (emphasis added). Therefore, this court is not at liberty to respond to Airborne's omission simply by deferring the question to the jury.

Under these circumstances, this court is left with two options: (1) allowing plaintiffs' § 1983 claims against Airborne to proceed to trial, and determining the issue of Gennarelli and Bezmen's final policymaker status at the close of plaintiffs' case, or (2) granting Airborne leave to renew its motion for summary judgment on the issue. Because the question of final policymaker status presents a discrete issue that is not otherwise intertwined with the resolution of the principal fact issues in this case and is one on which the court would benefit from written briefs by the parties, the latter approach will be taken. Accordingly, Airborne is given leave to renew its motion for summary judgment with respect to plaintiffs' § 1983 false arrest and malicious prosecution claims on this ground.

### B. Plaintiffs' § 1983 excessive force claim against Airborne must be dismissed.

Plaintiffs have not alleged that any Airborne employee was even present during the actual arrest, much less that an Airborne employee participated in the arrest and used excessive force against either plaintiff. Instead, plaintiffs predicate Airborne's liability for use of excessive force on its alleged role as an "active aider and abettor and co-conspirator" with the police defendants and S/A Tipton. (Compl.¶ 25.) Plaintiffs, however, have presented absolutely no evidence that any Airborne employee even reached a tacit understanding with the other defendants as to the amount of force to be used in making the Mejias' arrest. Accordingly, Airborne's motion for summary judgment on plaintiffs' § 1983 excessive force claims is granted.

### C. Plaintiffs' IIED claim against Airborne must be dismissed.

In their complaint, plaintiffs rely on the same allegations underlying their false arrest and malicious prosecution

---

falsely arrested plaintiff). As for *Rojas,* the district court relied on an *Adickes*-based theory of corporate liability when it decided a motion for summary judgment brought by the corporation. However, by the time the case went to trial, the district court had apparently abandoned the *Adickes* theory, for it submitted two special interrogatories to the jury: first, whether the store had probable cause to arrest the plaintiff; and second, whether the store had "a policy, custom or usage to discriminate against Hispanic customers on account of their race or national origin by subjecting them to increased suspicion and baseless arrest for shoplifting." *See Rojas,* 924 F.2d at 408. The jury answered both questions in the negative, and the district court entered judgment for the store. *See id.* On appeal, the plaintiff argued that that the jury's finding that the store lacked probable cause alone entitled him to judgment in his favor. *See id.* The Second Cir-

cuit rejected this argument and held that the corporation could not be held liable in absence of an official, unconstitutional policy, thus implicitly repudiating the district court's initial reliance on *Adickes. See Rojas,* 924 F.2d at 408–09.

**44.** Although the viability of plaintiffs' federal claims depends on their proof of an unconstitutional corporate policy, plaintiffs' failure to produce evidence of this element cannot be considered a jurisdictional defense. Even in the absence of plaintiffs' federal causes of action, this court would retain diversity jurisdiction over plaintiffs' remaining state law claims against Airborne, since the plaintiffs are citizens of New York, Airborne is incorporated in Delaware, its principal place of business is in Washington, and plaintiffs alleged damages are in excess of the jurisdictional amount at the time their complaint was filed. *See* 28 U.S.C. § 1332(a)-(b).

claims to support their claim that Airborne intentionally inflicted emotional distress on them, (Compl.¶¶ 24, 26), and their opposition brief on this motion does not otherwise amplify or clarify the basis of their IIED claim against it, (see Pls.' Mem. Opp'n at 41–43). Evidence of lack of probable cause that would support a claim for false arrest or malicious prosecution, however, is not sufficient to support an IIED claim, unless there is also evidence that the arrest or prosecution was accompanied by "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Murphy v. County of Nassau*, 203 A.D.2d 339, 341, 609 N.Y.S.2d 940, 942 (2d Dep't 1994) (denying summary judgment on false arrest and malicious prosecution claims, but granting summary judgment on IIED claim). Although plaintiffs have alleged conduct on Sergeant McNicholas's part that a jury could find extreme and outrageous, *see infra* Discussion (5)(D)(1), plaintiffs have not alleged, much less produced evidence, that any Airborne employee used any ethnic slur or made any threats against the Mejias during the course of the controlled pickup or arrest. Indeed, it is undisputed that no Airborne employee was even present at the scene of the actual arrest. Accordingly, Airborne's motion for summary judgment on plaintiffs' IIED claim is granted.

## D. Plaintiffs' state law claims for malicious prosecution, though meritorious, appear time-barred.

Because a reasonable juror could find that as a result of Airborne's knowing participation in the manufacturing of the incriminating evidence, it lacked probable cause for the Mejias' prosecution, *see supra* Discussion (3)(A)(1)(b), (3)(A)(2)(b), Airborne's motion for summary judgment on plaintiffs' state law malicious prosecution claim is denied.

 Notably, however, under New York law, a claim for malicious prosecution must be brought within one year after the cause of action accrues. *See* N.Y. C.P.L.R. § 215(3); *Bardi v. Warren County Sheriff's Dep't*, 260 A.D.2d 763, 764, 687 N.Y.S.2d 775, 776 (3d Dep't 1999). A cause of action for malicious prosecution accrues on the date that the criminal proceeding is terminated in favor of the plaintiff. *See Scomello*, 232 A.D.2d at 625, 648 N.Y.S.2d at 689. Here, Mr. Mejia was acquitted on March 20, 1995, and the grand jury had declined to indict Mrs. Mejia at an earlier date not specified in any of the briefs. (*See* Compl. ¶¶ 18–19.) Thus, plaintiffs' state law causes of action for malicious prosecution accrued on March 20, 1995, at the latest. Since plaintiffs' complaint was not filed until June 17, 1996—more than one year later—plaintiffs' state law malicious prosecution claims against Airborne appear time-barred.

 Strangely, Airborne did not raise this issue in its motion papers, despite the fact that it included the running of the statute of limitations among the defenses set forth in its answer. Instead, Airborne simply argues that plaintiffs' state law claims should be dismissed for lack of supplemental jurisdiction in the event that its motion for summary judgment on plaintiffs' federal claims is granted, (*see* Airborne's Mem. Supp. at 16)—an argument that is not well-taken since this court would retain diversity jurisdiction over plaintiffs' state law claims against it, *see supra* note 42. Nonetheless, it is wellestablished that the running of the statute of limitations is a nonjurisdictional defense that a district court may raise sua sponte, where the grounds for the defense appear on the face of the complaint and the defendant has pled untimeliness as a defense in its answer. *See Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir. 1980), *cited with approval, Snider v. Melindez*, 199 F.3d 108, 112 (2d Cir.1999). Here, as in *Leonhard*, that is the case. Accordingly, Airborne is given leave to renew its motion for summary judgment

on plaintiffs' state law claims on the ground that they are untimely.

## (4)

### S/A Tipton

Plaintiffs style their action against S/A Tipton as one arising under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and S/A Tipton has not contested the applicability of *Bivens* to this case.[45] In *Bivens*, the Supreme Court held that a cause of action arises directly from the Fourth Amendment where persons acting "under color of federal law" violate a person's right to be free from unreasonable searches and seizures. *See id.* at 392, 91 S.Ct. at 2002. Since the remedial purposes of *Bivens* and § 1983 are the essentially the same, courts have generally looked to the principles established in the case law construing § 1983 when deciding cases brought under *Bivens*. *See, e.g., Butz v. Economou*, 438 U.S. 478, 498–501, 98 S.Ct. 2894, 2906–08, 57 L.Ed.2d 895 (1978); *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir.1995) (per curiam). The general principles discussed above in relation to § 1983 are, therefore, equally applicable to plaintiffs' constitutional claims against S/A Tipton.

**A. Plaintiffs' *Bivens* false arrest and malicious prosecution claims present issues for the jury.**

 S/A Tipton moves for summary judgment on plaintiffs' *Bivens* false arrest claims on the grounds of probable cause and qualified immunity. Each set of claims is discussed in turn below.

**45.** It does not appear that plaintiffs need have relied on *Bivens* in this case, for where a defendant who is not a state official collaborates or conspires with state officials to deprive a plaintiff of a constitutional right, she may be held liable under § 1983 as a state actor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26

**1. False arrest**

**a. Mr. Mejia**

 For the reasons set forth above, *supra* Discussion (3)(A)(1)(a), (3)(A)(2)(a)(iii), whether S/A Tipton had probable cause at the time of Mr. Mejias's arrest or is otherwise entitled to qualified immunity on Mr. Mejia's false arrest claims reduces to two questions of fact: (1) Did she participate in the Venezuelan ruse?, and (2) Did she know that the package was from Colombia? Plaintiffs have demonstrated genuine issues of material fact on both questions.

First, it is simply inconceivable that Airborne's Gennarelli or Bezmen would have developed the idea to deceive Mr. Mejia about the package's origin on his own initiative. Thus, a reasonable juror could easily infer that one of the law enforcement officers involved in the case directed them to do so. S/A Tipton is the most obvious suspect, for she had numerous conversations with Bezmen and Gennarelli and arranged for the pickup to be made at Gennarelli's station on November 30th. At the very least, a reasonable juror could infer she was aware that "Luis" was being told the package was from Venezuela since: (1) she admits Gennarelli reported the content of the first phone call to "Luis" to her; and (2) she was at the Airborne office throughout the time that the portfolios were being repackaged and, thus, presumably at the time the Caracas airbill was created. Second, a reasonable juror could easily infer that S/A Tipton knew the package was in fact from Colombia, given her involvement in the case from its inception. Thus, a reasonable juror could find that she participated in the deception and did so knowingly. Accordingly, S/A Tipton's motion for summary judgment on

L.Ed.2d 142; *Price*, 383 U.S. at 794, 86 S.Ct. at 1157; *Singer*, 63 F.3d at 119. In any event, the legal basis for plaintiffs' constitutional claims against S/A Tipton—whether it be under *Bivens* or § 1983—is immaterial, for, as discussed above, the same substantive principles apply to both causes of action.

Mr. Mejias' *Bivens* false arrest claims is denied.

### b. Mrs. Mejia

 S/A Tipton argues that regardless of whether she can be held liable for Mr. Mejia's arrest, she cannot be held liable under *Bivens* for Mrs. Mejia's arrest because she did not directly and personally participate in Mrs. Mejia's arrest. (*See* S/A Tipton's Mem. Supp. at 19–20.) Although it is true that S/A Tipton did not personally effect Mrs. Mejia's arrest, there is another important basis for liability under § 1983 and, hence, *Bivens.* Pertinently:

> A police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability. *Id.* To recover on that ground, of course, a plaintiff must still overcome the hurdle of qualified immunity. A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's "clearly established statutory or constitutional rights" of which a reasonable person would have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Further, the failure to intercede must be under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40.

*Ricciuti,* 124 F.3d at 129. Even though S/A Tipton was a Customs agent and did not have authority over the police defendants, she was a law enforcement officer who was acting jointly with them in making the controlled pickup. As such, the principle that an officer has an affirmative duty to intercede applies equally to her.

Here, there is evidence on which a reasonable juror could find that neither S/A Tipton nor the police defendants had probable cause, or even an objectively reasonable belief that probable cause existed, with respect to Mr. Mejia. *See supra* Discussion (4)(A)(1)(a); *infra* Discussion (5)(A)(1), (6)(A)(1). Since defendants' avowed belief that probable cause existed with respect to Mrs. Mejia depends on the fact that she was in the car with Mr. Mejia and on the disputed fact that Mrs. Mejia had ripped open one of the portfolios, a reasonable juror could also find that S/A Tipton and the police defendants lacked probable cause, or even an objectively reasonable belief that probable cause existed, with respect to Mrs. Mejia. Under these circumstances, it would be objectively unreasonable for S/A Tipton—who it is not disputed was at the arrest scene—to believe that the police defendants' arrest of Mrs. Mejia did not violate Mrs. Mejia's clearly established right to be free from arrest without probable cause. Thus, S/A Tipton's failure to intercede to prevent Mrs. Mejia's arrest provides a basis for false arrest liability under *Bivens,* despite the fact that she did not personally effect the arrest. Accordingly, S/A Tipton's motion for summary judgment on Mrs. Mejia's *Bivens* false arrest claim is denied.

### 2. Malicious prosecution

 As discussed above, *supra* Discussion (3)(A)(1)(b), the only evidence that could potentially lead to a different result on the probable cause or qualified immunity analysis with respect to plaintiffs' malicious prosecution claims is the set of additional portfolios seized from the Mejias' office. S/A Tipton, however, has not established that there is no issue of fact as to whether she was aware of the existence of the additional portfolios at the time criminal proceedings were commenced against the Mejias. In deposition, she stated that at some point in time Detective Skinner advised her about the seizure, but she does not state when. (Tipton Dep. at 115–16.) Moreover, because a reasonable juror could find (1) that she was a knowing

participant in the Venezuelan ruse and was, thus, party to the creation of evidence on which the prosecutor relied in determining whether to commence and continue proceedings against the Mejias, and (2) that her grand jury testimony against them was false or contained material omissions, she would still not have probable cause or be entitled to qualified immunity with respect to the Mejias' prosecution even if the police defendants' knowledge of the additional portfolios could be attributed to her at the relevant time. *See supra* Discussion (3)(A)(1)(b). Accordingly, S/A Tipton's motion for summary judgment on plaintiffs' *Bivens* malicious prosecution claims is denied.

## B. Plaintiffs' *Bivens* excessive force claims against S/A Tipton presents an issue for the jury.

Although plaintiffs have not alleged that S/A Tipton personally used any force against them in the course of their arrests, she did have an affirmative duty as a law enforcement officer to intercede to prevent any violation of plaintiffs' clearly established rights by her NYPD counterparts that she witnessed during the course of the arrest. *See Ricciuti*, 124 F.3d at 129. Again, it is undisputed that S/A Tipton was at the scene of the arrest. Only the timing of her arrival is in question.

S/A Tipton asserts that she arrived at the arrest scene toward the later stages of the arrest because she just happened to pass by on her way back to her office. (Tipton Dep. at 103–04.) However, based on her testimony that she left the Airborne office "less than a minute" or "maybe 30 seconds" after the police defendants left, (*id.* at 102, 103), a reasonable juror could conclude that she arrived at the arrest scene at the same time as the police defendants. Consequently, it must be assumed for summary judgment purposes that she witnessed all the events that plaintiffs allege transpired in the course of their arrest. Plaintiffs' excessive force claim

against S/A Tipton, therefore, reduces to the question of whether plaintiffs' have produced evidence on which a reasonable juror could find that the police defendants used excessive force in making the arrest. They have.

### 1. Applicable Law

The basis for a § 1983 excessive force claim arising out of an arrest is the Fourth Amendment right " 'to be secure in their persons ... against unreasonable ... seizures.' " *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (quoting U.S. Const. amend. IV). In *Graham*, the Court explained that

proper application [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will

not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* at 396–97, 109 S.Ct. at 1872 (internal quotation marks and citations omitted).

## 2. A jury could find that the police defendants used excessive force in making the arrests and that S/A Tipton failed to intercede.

Plaintiffs appear to object to five aspects of the arrest: (1) Sergeant McNicholas and another officer allegedly approached the car with guns drawn, and Sergeant McNicholas banged on the window with his; (2) Sergeant McNicholas "pulled [Mrs. Mejia] out" of the car; (3) Sergeant McNicholas engaged in a pat down search of Mrs. Mejia; (4) Sergeant McNicholas handcuffed Mrs. Mejia, which made her hands sore and bruised; and (5) Detective Fox held a gun to Mr. Mejia's head.

At the outset, it is noted that none of these allegations would be sufficient to show an objectively unreasonable use of force if defendants had probable cause to believe the Mejias' were guilty of knowing possession of over one pound of cocaine. First, it would be reasonable for the police to approach the car with guns drawn and to brandish their weapons in the course of the arrest given the well-known, high level of violence that surrounds the cocaine trade and the large quantity of cocaine involved in this case. Second, there would be nothing unreasonable about Sergeant McNicholas physically removing Mrs. Mejia from the car. Moreover, she admits that she did not suffer any physical injury or pain as a result of the manner in which McNicholas removed her. (Aura Mejia Dep. at 83–84.) Third, Mrs. Mejia's objection to the pat down search was simply to the shock of the situation and her humiliation at being touched by a strange man. (*Id.* at 83, 182.) These, however, are the sort of inevitable indignities that must attend any arrest. Although the pat-down search was "rough, kind of quick, rough, sort of thing," she, again, felt no pain or physical injury as a result. (*Id.* at 181–82.) Finally, the fact that Mrs. Mejia's wrists were sore or bruised from the handcuffs, (*id.* at 84), would not by itself show an unreasonable amount of force was used, considering that she does not allege that she complained that the handcuffs were too tight, that she was cut, that she sought medical attention, or that she has suffered any permanent injury. (*Id.* at 83–84, 185) In fact, Mrs. Mejia stated that she did not even notice the bruises until the next day. (*Id.* at 185.)

 However, plaintiffs have produced evidence on the basis of which a reasonable juror could find that S/A Tipton and the police defendants did not have probable cause—or even an objectively reasonable belief that there was probable cause— to believe that the Mejias knowingly possessed the cocaine. Indeed, as discussed, there is evidence that these very defendants conspired to induce the Mejias to unwittingly take possession of the cocaine. Given that the objective reasonableness of the amount of force used depends critically on the severity of the crime for which the arresting officers had probable cause, *see Graham*, 490 U.S. at 396, 109 S.Ct. at 1872, where arresting officers do not even have an objectively reasonable belief that probable cause exists—and especially where those very officers manufactured the evidence on which they base their argument that probable cause existed—any use of force would be objectively unreasonable under the circumstances. Thus, there is evidence on which a reasonable juror could find that the police defendants used excessive force in making the arrests, and S/A Tipton would, if the jury so found, be jointly liable with them because she ignored her affirmative duty to intercede. Accordingly, S/A Tipton's motion for summary judgment on plaintiffs' *Bivens* exces-

sive force claims is denied.[46]

### C. Plaintiffs' IIED claims against S/A Tipton must be dismissed.

 Plaintiffs have not alleged that S/A Tipton used any abusive language or made any threats against them during their arrest. Indeed, according to plaintiffs' testimony, S/A Tipton only spoke to them on two occasions: first, when she allegedly asked Mr. Mejia to sign for the package at the Airborne office; and second, when, at the arrest scene, she allegedly asked Mrs. Mejia whether she had children. Thus, like their IIED claims against Airborne, plaintiffs' IIED claims against S/A Tipton appear to rest solely on their allegations of false arrest and malicious prosecution. Accordingly, for the same reasons discussed above in relation to their IIED claims against Airborne, *supra* Discussion (3)(C), S/A Tipton's motion for summary judgment on plaintiffs' IIED claims is granted.

### (5)

### Sergeant McNicholas

### A. Plaintiffs' § 1983 false arrest and malicious prosecution claims present issues for the jury.

Sergeant McNicholas moves for summary judgment on plaintiffs' § 1983 false arrest claims on the grounds of probable cause and qualified immunity. Each set of claims is considered, in turn, below.

### 1. False Arrest

 As is the case with S/A Tipton, the probable cause and qualified immunity determinations with respect to plaintiffs' false arrest claims against Sergeant McNicholas turn on whether he participated in the Venezuelan ruse and whether he knew the package was in fact from Colombia. *See supra* Discussion (4)(A)(1)(a). Plain-

tiffs' have demonstrated that material issues of fact exist as to both questions.

First, based on the facts that (1) Sergeant McNicholas coordinated with S/A Tipton throughout the investigation; (2) Sergeant McNicholas entered the Airborne conference room "just before [Detective Skinner] start[ed] packaging, putting the stuff into the Airborne box," (Skinner Dep. at 41); and (3) he was the supervising officer on the NYPD's end of the investigation, a reasonable jury could conclude that Sergeant McNicholas was aware that "Luis" was being told that the package was from Venezuela. Second, based on the facts that (1) he had several conversations with S/A Tipton regarding the case, and (2) he had an opportunity to examine the original IBC airbill when he was in the Airborne conference room, a reasonable juror could find that he knew the package was in fact from Colombia. Accordingly, Sergeant McNicholas's motion for summary judgment on plaintiffs' § 1983 claims is denied.

### 2. Malicious Prosecution

### a. Plaintiffs have demonstrated that there is a genuine issue of material fact as to whether Sergeant McNicholas had probable cause for their prosecution.

 Unlike Airborne and S/A Tipton, Sergeant McNicholas obviously knew at the time criminal proceedings were commenced that additional portfolios had been seized from the Mejias' office—he, together with Detective Skinner, seized them. However, given that a reasonable jury could find that Sergeant McNicholas knowingly participated in the Venezuelan ruse and has concealed his role in it, a reasonable juror could also discredit his testimony that the additional portfolios had been ripped open. Thus, viewing the evidence in the light most favorable to the plaintiffs and drawing all reasonable infer-

---

46. The virtual absence of physical injury to plaintiffs will, of course, minimize any damages that could be awarded if S/A Tipton or the police defendants are held liable for use of excessive force.

ences in their favor, it must be assumed that the additional portfolios had not been ripped open. For the reasons set forth above, *supra* Discussion (3)(A)(1)(b), the assumed presence of additional, unopened portfolios in the Mejias' office was not—in view of the alleged deception necessary to induce them to claim the package—sufficient to give him probable cause for the commencement or continuation of proceedings against them.

### b. Qualified Immunity

█ Although Sergeant McNicholas did not file the arrest affidavit charging the Mejias with criminal possession and did not testify before the grand jury, if the jury found that Sergeant McNicholas conspired with the charging officer to manufacture the evidence on which the prosecutor relied in determining whether to commence and continue proceedings against the Mejias, there would be no qualified immunity. Accordingly, for the reasons stated above, Sergeant McNicholas is not entitled to qualified immunity on plaintiffs' malicious prosecution claims.

### 3. Summary

For the foregoing reasons, Sergeant McNicholas's motion for summary judgment on plaintiffs' § 1983 false arrest and malicious prosecution claims is denied.

### B. Plaintiffs' § 1983 excessive force claims present an issue for the jury.

For the reasons set forth above with respect to S/A Tipton, *see supra* Discussion (4)(B)(2), Sergeant McNicholas's motion for summary judgment on plaintiffs' excessive force claims is denied.

### C. Plaintiffs' state law false arrest claims must be dismissed.

█ Sergeant McNicholas argues that plaintiffs' state law false arrest claims against him must be dismissed for failure to comply with New York's one-year statute of limitations on intentional torts. *See* N.Y. C.P.L.R. § 215(3). A cause of action for false arrest accrues when the confinement terminates. *See Kramer v. Herrera,* 176 A.D.2d 1241, 1241, 576 N.Y.S.2d 736, 737 (4th Dep't 1991). Release on bail constitutes a termination of confinement. *Iazzetta v. State,* 105 Misc.2d 687, 432 N.Y.S.2d 987, 989 (N.Y.Ct.Cl.1980) (citing *Schildhaus v. City of New York,* 23 A.D.2d 409, 261 N.Y.S.2d 909 (1st Dep't 1965), *aff'd,* 17 N.Y.2d 853, 271 N.Y.S.2d 286, 218 N.E.2d 325 (1966); *Molyneaux v. County of Nassau,* 22 A.D.2d 954, 256 N.Y.S.2d 123 (2d Dep't 1964), *aff'd,* 16 N.Y.2d 663, 261 N.Y.S.2d 294, 209 N.E.2d 286 (1965)). Here, Mrs. Mejia was released on bail on December 1, 1993, and Mr. Mejia was released on bail on or about December 3, 1993, but they did not file their complaint until more than one year later, viz., June 17, 1996. Because Sergeant McNicholas pled the defense in his answer, and plaintiffs have come forward with no evidence that would support applying the doctrines of tolling or estoppel in this case, Sergeant McNicholas's motion for summary judgment on plaintiffs' state law false arrest claims is granted.

### D. Plaintiffs' IIED claims present an issue for the jury, but appear time-barred.

#### 1. Plaintiffs have produced evidence of conduct sufficiently extreme and outrageous to state a claim for IIED.

█ In their depositions, plaintiffs have identified Sergeant McNicholas as one of the principal sources of the disparaging remarks allegedly made regarding their Colombian nationality and as the source of the threats that Mrs. Mejia's children would be taken from her. Moreover, they have alleged, and this court has found that there is evidence on which a reasonable juror could find, that Sergeant McNicholas falsely arrested, used excessive force against, and maliciously prosecuted them. Finally, Detective Skinner testified that Sergeant McNicholas or-

dered Mrs. Mejia to undergo a strip search.

For his part, Sergeant McNicholas denies that he made any disparaging remarks against the Mejias or threatened that Mrs. Mejia would lose her children and argues that, even if he did, such remarks are not sufficiently extreme and outrageous, as a matter of law, to support a cause of action for IIED.

On a motion for summary judgment, plaintiffs' deposition testimony and other evidence favorable to them must be taken as true; therefore, the only question to be resolved here is whether their allegations suffice to state a claim for IIED. In making this sufficiency determination, plaintiffs' IIED claims against Sergeant McNicholas must be evaluated in light of his entire alleged course of conduct. *See Stram v. Farrell*, 223 A.D.2d 260, 265, 646 N.Y.S.2d 193, 196 (3d Dep't 1996); *see also Holder v. Ivanjack*, 39 F.Supp.2d 965, 970 (N.D.Ill.1999) (applying Illinois law); *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo.Ct.App.1982) (applying Colorado law). While certain of plaintiffs' allegations would not, by themselves, necessarily rise to the level of extremity and outrageousness to support an IIED claim, his total alleged course of conduct does.

First, made concerning Mrs. Mejia's children would not, in the presence of an objectively reasonably belief that probable cause existed, reach the level of outrage necessary to support a claim of intentional infliction of emotional distress. The New York Court of Appeals has adopted the formulation given in the *Restatement (Second) of Torts* § 46 (1965) as the standard for establishing a cause of action for IIED. *See Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215 (1978). Notably, the Illustrations to § 46 show a particular solicitude towards the emotional well-being of pregnant women and mothers. *See Restatement, supra*, § 46 illustrations 11 (tortfeasor shoots pregnant woman's beloved dog before her eyes), 19 (in effort to extort confession from mother, police officer tells lie that her child is dying at the hospital). Each of those illustrations either involved outrageous conduct that caused a pregnant woman such shock that she had a miscarriage or involved a defendant who made severely distressing and false claims about a woman's children.

Here, the remarks Sergeant McNicholas allegedly made during interrogation concerning Mrs. Mejia's unborn child and her daughter did not cause a miscarriage and were true. If Mrs. Mejia were convicted and sent to prison before the baby was born, she would have her baby in prison. And if she did have the baby in prison, she would not be able to keep the child with her indefinitely. Nor would she be able to see her other child often, and she might even lose custody of both if she were imprisoned for a sufficiently long time. Sergeant McNicholas's estimate of fifteen years of incarceration was also accurate: possession of over four ounces of cocaine is a Class A–I felony under New York law punishable by a minimum of 15 to 25 years imprisonment. *See* N.Y. Penal Law § 220.21 (defining criminal possession of a controlled substance in the first degree and stating that it is an A–I felony); *id.* § 70.00[3][a][i] (providing for minimum term of incarceration for A–I felony). If Sergeant McNicholas had at least an objectively reasonable belief that there was probable cause to believe Mrs. Mejia guilty of Criminal Possession in the First Degree, the fact that Sergeant McNicholas related disturbing, but true facts about the likely consequences of Mrs. Mejia's conviction in order to induce her to cooperate, such remarks would not be sufficiently extreme or outrageous to state a claim for intentional infliction of emotional distress. However, in light of the evidence discussed above that Sergeant McNicholas had conspired to manufacture the evidence on which such a conviction would be based— viz., the Mejias' possession of the cocaine, his actions do begin to take on an extreme and outrageous character.

Second, Sergeant McNicholas's alleged repeated use of ethnic slurs against them during the course of the Mejias' arrest and subsequent interrogation would probably be sufficient on its own to state a claim for IIED. Several courts have held that a police officer's use of ethnic slurs, when coupled with use of excessive force, is sufficient to state an IIED claim. *See, e.g., Holder v. Ivanjack,* 39 F.Supp.2d at 970 (applying Illinois law) (holding that plaintiff stated IIED claim where officers yelled racial slurs at, attacked, and filed false charges against him); *Oliver v. Cuttler,* 968 F.Supp. 83, 93 (E.D.N.Y.1997) (applying New York law) (holding that plaintiff stated IIED claim where officer allegedly "hurled racial epithets at him and struck him" without provocation). Indeed, at least one court has held that even in the absence of excessive force, allegations that a police officer uses ethnic slurs against arrestees suffice to state an IIED claim. *See Kelly v. City of Minneapolis,* 598 N.W.2d 657, 660–61, 663 (Minn.1999) (upholding jury verdict on IIED claim in favor of arrestees where officers used justifiable force but also used racial epithet and disparaging names). *But see Watkins v. City of Southfield,* 221 F.3d 883, 890 (6th Cir.2000) (applying Michigan law) (holding that motorist's allegation that racial epithet was used against him, coupled with officers' justifiable use of force, did not state IIED claim).

An examination of the principles underlying the IIED cause of action confirms that a police officer who uses ethnic slurs against an arrestee can be held liable for IIED. Although liability under § 46 does not generally "extend to mere insults, indignities, threats," or "rough language," *Restatement, supra,* § 46 cmt. d; *see Leibowitz v. Bank Leumi Trust Co.,* 152 A.D.2d 169, 181–82, 548 N.Y.S.2d 513, 521 (2d Dep't 1989); *Williams v. Port Authority of N.Y. & N.J.,* 880 F.Supp. 980, 994 (E.D.N.Y.1995), the "extreme and outrageous character of the conduct may arise from an abuse by the actor of a position

... which gives him actual or apparent authority over the other, or power to affect his interests," *Restatement, supra,* § 46 cmt. e. The Restatement Comments specifically identify police officers as falling into this latter class. *See id.* Thus, while Sergeant McNicholas's alleged disparaging remarks regarding Colombians would not be sufficiently extreme and outrageous to state an IIED claim had they come from a private citizen or from a public official who did not have power to affect the Mejias' interests, those same remarks if uttered by a police officer—especially an arresting officer who had the plaintiffs in custody—may well fall within the *Restatement*'s, and hence, New York's, definition of extreme and outrageous conduct.

Finally, Sergeant McNicholas ordered Mrs. Mejia to be strip searched, a highly "intrusive and demeaning" procedure, *see Ciraolo v. City of New York,* 216 F.3d 236, 238 (2d Cir.2000). Given that there is evidence that Sergeant McNicholas lacked an objectively reasonable belief that Mrs. Mejia had committed any drug-related crime, such a search could not be justified on a reasonable suspicion that she might be carrying additional contraband. Nor would it appear that Sergeant McNicholas ordered the search out of a reasonable suspicion that Mrs. Mejia might be carrying a weapon, since Mrs. Mejia had already been pat-down searched at the arrest scene and Sergeant McNicholas had previously removed Mrs. Mejia's handcuffs when he searched the Mejias' office, (McNicholas Dep. at 76) (explaining that he did so, in part, because "I had no reason to believe there would be any trouble with [the garage employees], *especially with her*" (emphasis added)). Sergeant McNicholas's act of ordering what, therefore, must be assumed was an unjustified strip search further contributes to the extreme and outrageous character of his overall alleged course of conduct.

Collectively, these actions are sufficiently extreme and outrageous to state a claim for IIED under New York law. Accord-

ingly, Sergeant McNicholas's motion for summary judgment on plaintiffs' IIED claim is denied.

### 2. Plaintiffs' IIED claims appear time-barred on the face of their complaint.

Although plaintiffs' IIED claims against Sergeant McNicholas are sufficient as a matter of law and evidence to go to the jury, they appear time-barred. The statute of limitations on a cause of action for IIED is one year. *See* N.Y. C.P.L.R. § 215(3); *Spinale v. Guest*, 270 A.D.2d 39, 40, 704 N.Y.S.2d 46, 47 (1st Dep't 2000). Plaintiffs' complaint expressly alleges that the conduct in question took place on November 30, 1993, but they did not file their complaint until June 17, 1996. Oddly, Sergeant McNicholas pled untimeliness as a defense in his answer and argues it with respect to his motion for summary judgment on plaintiffs' state law false arrest claims, but he did not raise it in his motion papers with respect to plaintiffs' IIED claims. Nonetheless, because the defense appears on the face of the complaint and Sergeant McNicholas pled running of the statute, he is granted leave to renew his motion for summary on plaintiffs' IIED claims on the ground that they are untimely. *See Leonhard*, 633 F.2d at 609 n. 11.

### (6)

### Detective Skinner

### A. Plaintiffs' § 1983 false arrest and malicious prosecution claims present issues for the jury.

Detective Skinner moves for summary judgment on plaintiffs' § 1983 false arrest and malicious prosecution claims on the ground that he had probable cause, or, in the alternative, on the ground that he is entitled to qualified immunity. Each set of claims is considered, in turn, below.

### 1. False Arrest

As is the case with the other defendants, whether Detective Skinner had probable cause for the Mejias' arrests or is otherwise entitled to qualified immunity on plaintiffs' false arrest claims turns on whether he knowingly participated in the ruse about the package's origin. *See supra* Discussion (3)(A)(1)(a), (3)(A)(2)(a)(iii), (4)(A)(1)(a), (5)(A)(1). As with the other defendants, plaintiffs have demonstrated that there is a genuine issue of material fact as to whether he did.

First, Detective Skinner testified that while he was repackaging the portfolios, he examined the original IBC airbill. (Skinner Dep. at 35.) Moreover, he examined it closely enough to recall that it listed no individual addressee. (*Id.* at 35–36.) From these facts, a reasonable juror could conclude that he must have also noticed that the sender's address was in Columbia. Moreover, Detective Skinner testified that he had a conversation with S/A Tipton, which included her telling him that the package had been intercepted and field tested in "another state." (*Id.* at 40.) A reasonable juror could infer that this conversation also included a remark that the package had been sent from Columbia. Second, Detective Skinner testified that he placed the new Airbill, which allegedly had already been filled out by someone else, on the package. (*Id.* at 39–40.) Given the care with which Detective Skinner examined the original airbill and the condition of the portfolios and their original packaging, (*see id.* at 24–29, 34–35), a reasonable juror could infer that Detective Skinner also examined the new airbill and recognized the discrepancies between it and the original. From the fact that Detective Skinner does not recount making any inquiry about the discrepancy, a reasonable juror could further infer that he was privy to the fact that "Luis" had been told that Airborne had a package from Venezuela for him. Accordingly, Detective Skinner's motion for summary judgment on plaintiffs' § 1983 false arrest claims is denied.

### 2. Malicious Prosecution

Because there is evidence on which a reasonable juror could find that

Detective Skinner knowingly participated in the Venezuelan ruse and thereafter misrepresented (or concealed) the true circumstances of the controlled pickup to (or from) the prosecutor, genuine issues of material fact preclude finding either that he had probable cause or is otherwise entitled to qualified immunity for his actions in commencing and continuing proceedings against the Mejias, notwithstanding his seizure of additional portfolios from the Mejias' office. *See supra* Discussion (3)(A)(1)(b). Accordingly, Detective Skinner's motion for summary judgment on plaintiffs' § 1983 malicious prosecution claims is denied.

### B. Plaintiffs' § 1983 excessive force claims present an issue for the jury.

■ Although plaintiffs have not alleged that Detective Skinner personally participated in the use of force against them, they have presented evidence that force was used that was excessive in light of the police defendants' lack of an objectively reasonable belief that probable cause existed. *See supra* Discussion (4)(B)(2). If those were the true circumstances, then Detective Skinner had an affirmative duty to intercede to prevent the use of such force and can be held liable for his passivity in the face of such abuses. *See Ricciuti,* 124 F.3d at 129. Accordingly, Detective Skinner's motion for summary judgment on plaintiffs' excessive force claims is denied.

### C. Plaintiffs' state law false arrest claims must be dismissed.

For the reasons set forth above, *supra* Discussion (5)(C), Detective Skinner's motion for summary judgment on plaintiffs' state law false arrest claims is granted on the ground that they are barred by New York's one-year statute of limitations on intentional torts.

### D. Plaintiffs' IIED claims must be dismissed.

■ As is the case with S/A Tipton and Airborne, plaintiffs have produced no evidence that Detective Skinner made any disparaging remarks concerning their nationality or made any threats to Mrs. Mejia concerning her unborn child. Indeed, Mr. Mejia testified that the only time Detective Skinner spoke to him was to identify himself as the arresting officer at the scene of the arrest, and Mrs. Mejia denied that he spoke to her at all. Accordingly, for the reasons set forth above, *supra* Discussion (3)(C), Detective Skinner's motion for summary judgment on plaintiffs' IIED claim is granted.

### Conclusion

In closing, it must be stressed that nothing in this opinion should be taken as an indication that the court has judged plaintiffs' allegations to be an accurate account of what transpired here. Indeed, in view of the numerous discrepancies between the parties' accounts of what happened, the entire case has a distinct *Rashomon* quality about it. As discussed at length above, defendants have not provided any satisfactory explanation of the Caracas airbill. However, plaintiffs' testimony conflicts (1) with defendants' testimony on points on which defendants have no apparent motive to lie—e.g., plaintiffs' account that it was Sergeant McNicholas rather than Detective Skinner who removed Mrs. Mejia from their car and who questioned them at the precinct, (2) with each others' accounts—e.g., Mr. Mejia testified that S/A Tipton appeared at the arrest scene dressed in an Airborne uniform, while Mrs. Mejia testified that she was not so dressed, and (3) even internally—e.g., Mr. Mejia testified that for three weeks prior to his arrest on November 30th, his employee Acevedo had been pestering him about whether any mail had arrived for him from Colombia, yet Mr. Mejia later testified that when a package from Colombia (viz., that containing the additional portfolios) was delivered to the garage on November 29th,

he and his wife were baffled over whom it might be for and never mentioned it to Acevedo, who was there at the time. A reasonable juror could well conclude that none of the witnesses has been entirely truthful in his or her account of what happened here. The court has only found that plaintiffs have demonstrated genuine issues of material fact that make summary judgment inappropriate—with respect to some of the defendants and some of the claims just barely.

Therefore:

(1) the City's motion for summary judgment has been granted;

(2) Airborne's motion for summary judgment has been granted with respect to plaintiffs' § 1983 excessive force claims and their IIED claims, but denied with respect to plaintiffs' § 1983 false arrest and malicious prosecution claims, and their state law malicious prosecution claims;

(3) S/A Tipton's motion for summary judgment has been granted with respect to plaintiffs' *Bivens* excessive force claims and their IIED claims, but denied with respect to plaintiffs' *Bivens* false arrest and malicious prosecution claims;

(4) Sergeant McNicholas's motion for summary judgment has been granted with respect to state law false arrest claims, but denied with respect to plaintiffs' § 1983 false arrest, malicious prosecution, and excessive force claims, and their IIED claims; and

(5) Detective Skinner's motion for summary judgment has been granted with respect to plaintiffs' state law false arrest and IIED claims, but denied with respect to plaintiffs' § 1983 false arrest, malicious prosecution, and excessive force claims.

In addition, leave is hereby granted:

(1) to Airborne to renew its motion for summary judgment (a) on plaintiffs' § 1983 false arrest and malicious prosecution claims on the ground that plaintiffs have not shown that Airborne's alleged constitutional violations resulted from an official policy of Airborne, and (b) on plaintiffs' state law malicious prosecution claims on the ground that they are untimely; and

(2) to Sergeant McNicholas to renew his motion for summary judgment on plaintiffs' IIED claims the ground that they are untimely.

If Airborne or Sergeant McNicholas elects to so renew their motions, they shall promptly contact the court to schedule an appropriate discovery and briefing schedule. Dated: Brooklyn, New York